UNITED STATES STEEL CORP.,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

REPUBLIC STEEL CORPORATION,
Petitioner,

v.

ENVIRONMENTAL PROTECTION
AGENCY, Respondent.

Nos. 78–1922, 78–1927.

United States Court of Appeals,
Fifth Circuit.

May 3, 1979.

Thomas, Taliaferro, Forman, Burr & Murray, J. Ross Forman, III, Robert G. Tate, Birmingham, Ala., for petitioner in No. 78–1922.

James W. Moorman, Asst. Atty. Gen., Angus Macbeth, Chief Pollution Control Sec., Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for respondent in No. 78–1922.

Phelps, Dunbary, Marks, Claverie & Sims, Eugene R. Preaus, New Orleans, La., Thorp, Reed & Armstrong, Peter G. Veeder, Pittsburgh, Pa., for petitioner in No. 78–1927.

Douglas M. Costle, Administrator, E. P. A., James N. Cahan, Atty., U. S. Environmental Protection Agency, Washington, D. C., Barbara Brandon, Asst. Atty. Gen., Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for respondent in Nos. 78–1922 and 78–1927.

Before GODBOLD, Circuit Judge, SKELTON,[*] Senior Judge, and RUBIN, Circuit Judge.

[*] Senior Judge, United States Court of Claims, sitting by designation.

1. The Act is codified at 42 U.S.C. §§ 7401–7642. We will hereafter cite only to U.S. Code sections.

 The § 7407(d) designation was published as a "Final rule" on March 3, 1978, 43 Fed.Reg. 8962, and republished on September 11, 1978, 43 Fed.Reg. 40412.

GODBOLD, Circuit Judge:

Petitioners United States Steel and Republic Steel have petitioned for review of the Environmental Protection Agency's designation of areas in Alabama as nonattainment areas for suspended particulate pollution pursuant to § 107(d) of the Clean Air Act, 42 U.S.C. § 7407(d).[1] These designations mean that particulate levels in these areas[2] exceed the national primary ambient air quality standards set by the EPA under § 7409.

The steel companies' challenges rest on several grounds, substantive as well as procedural. We do not reach the substantive issues on either petition, for we agree with both petitioners that in making the designations the EPA failed to follow the procedures required by the Administrative Procedure Act, 5 U.S.C. § 553. We therefore set aside the designations and remand to the Agency so that it may repromulgate the Alabama nonattainment list after proper public notice and opportunity to comment.

We begin with a consideration of the purposes and effects of the § 7407(d) designations, for these factors are critical in our evaluation of the major legal issues raised: ripeness of the action for judicial review, applicability of the "good cause" exception to notice and comment under 5 U.S.C. § 553, and the Agency's claim of harmless error.

The primary function of the designations is as a preliminary step in formulating a state plan to meet all primary ambient air quality standards. Congress recognized in 1977 that these standards were not met by the original target dates,[3] and provided for a new timetable in the Clean Air Act Amendments of 1977, P.L. 95–95, 91 Stat. 685. The states[4] were directed to submit a

2. The challenged designations involve parts of Jefferson County (U.S. Steel) and Etowah County (Republic Steel).

3. See H.Rept. 95–294 at 207, U.S.Code Cong. & Admin.News, p. 1077 (1977).

4. The Alabama agency responsible for state actions required by the Act is the Alabama Air Pollution Control Commission (AAPCC).

list of nonattainment areas to the EPA by December 5, 1977 (120 days after the date of enactment of the 1977 Amendments). 42 U.S.C. § 7407(d)(1). The EPA was then to review, modify if necessary, and promulgate the lists within 60 days. § 7407(d)(2). Thus the EPA promulgation should have occurred by February 3, 1978. These designations are among the factors to be taken into account by a state in development of its state implementation plan (SIP) to attain the primary standards, 42 U.S.C. §§ 7410, 7502. Submission of the SIP revisions was due January 1, 1979 (§ 129(c) of the Amendments, 91 Stat. 750–51 (uncodified)); the submission must provide for attainment of the primary standard for particulates by December 31, 1982.[5] The procedures quickly fell behind the statutory schedule. The AAPCC submitted its list December 22, 1977, and the EPA promulgated it March 3, 1978.

■ The EPA is correct in characterizing the nonattainment designation, insofar as it is part of the SIP revision process, as a preliminary step that in itself would perhaps be unripe for judicial review. But even accepting this point, and disregarding U.S. Steel's claim that it has already been harmed by the AAPCC's response to the designation,[6] we find that the designations have consequences apart from their role in the SIP revision process that constitute a substantial injury to the petitioners and clearly make the controversy ripe for review. These consequences arise from the EPA's interpretive ruling of December 21, 1976, concerning emission offsets (the Off-

set Ruling), 41 Fed.Reg. 55524. The Offset Ruling places strict limitations on construction of new facilities, or modification of existing facilities, that will contribute to an existing violation of a national ambient air quality standard. Such construction will only be allowed if the proposed facility will use the requisite technology to attain "the lowest achievable rate for such type of source" and if new emissions from the proposed facility will be more than offset by reductions elsewhere.[7]

Moreover, the Offset Ruling is not a mere statement of policy. Its provisions have the force of law and are enforceable by the EPA. In enacting the Amendments, Congress explicitly adopted the Ruling, with minor modification, as an interim limitation on construction in nonattainment areas.[8] Another provision of the Amendments empowers the EPA, if it finds that a state is not enforcing the provisions of the Ruling, to enforce it directly. 42 U.S.C. § 7413(a)(5). In such a situation the EPA may sue to enjoin construction and for a civil penalty of up to $25,000 per day. 42 U.S.C.A. § 7413(b)(5).

EPA concedes the petitioners' contention that the § 7407(d) designations are ripe for review, and we agree. The leading case on the issue of ripeness is *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). There the Court allowed a challenge to an FDA drug labeling rule, emphasizing the great risk of loss to the petitioners if they had to await enforcement to challenge the rule's validity. Such

---

5. Under some conditions attainment may be delayed for certain other pollutants until December 31, 1987. § 7502(a)(2).

6. U.S. Steel claims that the AAPCC has recently promulgated regulations pertaining to coke ovens. The AAPCC regulations are not part of the Administrative Record on appeal. Since we find that there is other injury to petitioners, we need not consider this matter any further, nor need we rule on U.S. Steel's motion to add pertinent material to the record pursuant to F.R.A.P. 16(b).

7. The required offset may be from facilities of the proposing owner or from other facilities. However, due to the localized nature of the impact of particulate emissions, such offsets

will usually be required to be "on the same premises or in the immediate vicinity of the new source." Ruling Pt. IV, ¶ D, 41 Fed.Reg. at 55529.

8. P.L. 95–95, § 129(a), 91 Stat. 745 (uncodified). The effect of § 129(a) was intended to expire as of July 1, 1979, at which time it was to be replaced by the substantially similar provisions of 42 U.S.C. § 7503. For the reasons discussed below, our remand necessitates the extension of § 129(a) beyond July 1. Under either provision, however, it is clear that the EPA has enforcement authority over new construction in a nonattainment area.

loss included the possibly wasteful reprinting of labels and other materials, as well as criminal and civil penalties that could be imposed in enforcement proceedings. *Id.* at 152–53, 87 S.Ct. at 1517, 18 L.Ed.2d at 694. The situation here is similar. If the § 7407(d) designations are valid, they necessarily bring the Offset Ruling into play with regard to any proposed new sources in the area.[9] If the petitioners were forced to wait to challenge the designations until the EPA took enforcement action under § 7413(b)(5), they would face similar risks of civil penalties and lost investment in uncompleted improvements.[10] We therefore find the controversy ripe for review.

■ Having determined the EPA's action reviewable, we must still determine whether we are the appropriate reviewing court. We recently held in *PPG Industries, Inc. v. Harrison*, 587 F.2d 237 (CA5, 1979), that despite the 1977 revisions to 42 U.S.C. § 7607(b), which provides for direct review in the courts of appeals of certain EPA actions, some actions will be reviewable only in the district courts. Our reason for that holding was our recognition that "the mechanical limitations of the courts of ap-

peals" make impracticable their review of agency actions that are made without the development of a full record. *Id.* at 244–45. Jurisdiction was found lacking in *PPG Industries* because the action there (a ruling that a certain regulation was applicable to a specific plant) was evidenced only by an exchange of correspondence. Here the challenged action is EPA promulgation of regulations that have general effect in the specified areas, and it was based on a substantial record.[11] We therefore find that the considerations that gave rise to the result in *PPG Industries* are absent, and we have jurisdiction under § 7607(b).

■ On the merits the petitioners' principal argument is that before making the § 7407(d) designations, the EPA was obliged under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq., to give notice and receive pre-promulgation comments from interested parties. Clearly there was no notice and comment period before the March 3, 1978 promulgation of the list. The EPA did attempt to provide opportunity for input by affected parties by accepting comments for 60 days after the

9. The Ruling expressly applies to any new construction that "would exacerbate an 'existing' violation . . . of a NAAQS [national ambient air quality standard]." Ruling, Pt. IV, 41 Fed.Reg. at 55528 (December 21, 1976). Therefore any new source in a designated area would necessarily be subject to it. The EPA argues that a § 7407(d) designation is not conclusive in decisions under the Ruling, and quotes from a recent agency statement that the Ruling applies "regardless of the designation applicable to the locality where the source or the violation is found." 43 Fed.Reg. 40412, 40413 (September 11, 1978). However, this statement when read in context is clearly aimed at the problem of a polluter outside of a nonattainment area contributing to a violation within it. The September 11 statement indicates that such polluters are subject to the Offset Ruling without regard to their being outside. It does nothing to contradict the fact that the Ruling applies to any new source within a designated area.

10. EPA argues that petitioners will have an opportunity to challenge the § 7407(d) designation in conjunction with the process of revising the implementation plan. But the Offset Ruling, as enacted by § 129(a) of the Amendments, is an interim measure that does not require existing SIP provisions. Enforcement of it un-

der § 7413(b)(5) could occur before the SIP revisions are final and reviewable. This case is therefore distinguishable from *Bethlehem Steel v. EPA*, 536 F.2d 156 (CA7, 1976). There the designation of an air quality maintenance area was held unripe because the only effect of the designation was to begin a process of developing emissions standards.

11. U.S. Steel has moved to have items added to the Administrative Record pursuant to F.R.A.P. 16(b), but since they are documentary the problem of *PPG Industries* is not posed by them. Moreover, in light of the conclusions we have reached on the merits of petitioners' procedural claims, we deem it unnecessary to rule on the motion. Among the proffered items the only one relevant to our disposition is the EPA's Offset Ruling. Since this was published in the Federal Register we may consider it regardless of whether it is part of the record. Similarly we find it unnecessary to rule on U.S. Steel's motion to reconsider this court's grant of EPA's motion to supplement the record. The subject of the latter motion was the EPA's September 11, 1978 repromulgation of the nonattainment list, which was also published in the Federal Register.

March 3 promulgation, which were used in making modifications to the designation list. The list was repromulgated on September 11, 1978, 43 Fed.Reg. 40412, with several changes, although none affecting the challenged designations. We agree with petitioners that the EPA's procedures failed to comply with the APA and that we must remand for reconsideration of the designations.

EPA does not contend that its § 7407(d) designations were not "rules" under the APA or that they are not therefore subject to the rule making provisions of § 553. Indeed, the designations clearly come within the broad statutory definition, 5 U.S.C. § 551(4), since they are agency statements of future effect[12] designed to "implement, interpret, or prescribe law or policy." Instead the EPA recognized the APA's approach of defining "rule" very broadly but creating substantial exceptions to the procedural requirements of § 553. The exception claimed is that of § 553(b)(B), which provides that notice of proposed rule making need not be given

> when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

The EPA included a statement of the sort required in its March 3, 1978 designation.[13] Its principal argument appears to be that compliance with the statutory timetable required action without the usual notice and comment period. The Agency was under pressure, since the time allowed by Congress was short. But the mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception. *American Iron and Steel Institute v. EPA*, 568 F.2d 284, 292 (CA3, 1977); *Shell Oil Co. v. FEA*, 527 F.2d 1243, 1248 (TECA 1975). The deadline is a factor to be considered, but the agency must still show the impracticability of affording notice and comment. Here, for example, the EPA gives no explanation of why it could not at least have published the AAPCC's initial list upon receipt and accepted comments during the time it was reviewing the list. This would have afforded petitioners some warning of the imminent designations and allowed them opportunity to influence the agency's action.

Moreover, it is clear that the EPA did not regard the statutory deadline as sacrosanct, since the nonattainment list was not published until a full month after the deadline.[14] The EPA therefore stresses as

---

**12.** As indicated above, the effect is twofold: limiting new construction by the Offset Ruling and beginning the process of SIP revision.

**13.** The full text of the statement, which appears at 43 Fed.Reg. 8962, is as follows:

> The States are now preparing revisions to their State implementation plans (SIPs) as required by sections 110(a)(2)(I) and 172 of the Act [42 U.S.C. §§ 7410(a)(2)(I), 7502]. This enterprise, which must be completed by January 1, 1979, requires that the States have immediate guidance as to the attainment status of the areas designated under section 107(d). Congress has acknowledged this by imposing a tight schedule on the designation process and requiring EPA to promulgate the list within 180 days of the enactment of the amendments. Under these circumstances it would be impracticable and contrary to the public interest to ignore the statutory schedule and postpone publishing these regulations until notice and comment can be effectuated. For this good cause, the Administra-

> tor has made these designations immediately effective.

> The statement appears to invoke both the notice and comment exception of § 553(b)(B) and a similar exception contained in § 553(d)(3) of the requirement that a rule be published not less than 30 days before its effective date. The only question before us here is the notice and comment exception of § 553(b)(B).

**14.** Republic Steel argues that the § 7407(d) designations are invalid because they were not published in accordance with the statutory timetable. Its argument is based on § 7407(d)(4), which provides that any areas not classified within 180 days of the enactment of the 1977 Amendments must be deemed unclassifiable under § 7407(d)(1)(D). Carried to its logical conclusion, the argument is that once the February 3, 1978 deadline passed, the EPA was forever barred from making designations. Such an assertion is inconsistent with the general purpose and approach of the Amendments and if followed would thwart the intent of Congress to have the designations and SIP revi-

the good cause justifying noncompliance the need to provide guidance to the states in formulating their SIP revisions. This argument falters for several reasons. First, the respective states already had most of the information contained in the EPA's designations, since those designations were based on submissions by the states. The statute indicates that the EPA's role is limited to reviewing the state designations and modifying them where necessary. 42 U.S.C. § 7407(d)(2). The states could have begun the revisions with the information on hand, changing them later as required by EPA alterations of the § 7407(d) list.

Furthermore, the EPA undercuts its own argument on this point by repeatedly emphasizing elsewhere the preliminary nature of the § 7407(d) designations in the entire process. The designations had little legal effect on the states; rather they were important in guiding the SIP revisions. The same guidance that was accomplished by the EPA's procedures could have been accomplished by issuing a proposed list in March, followed by final promulgation after notice and comment. Indeed the major difference between such a procedure and that chosen by the Agency had nothing to do with guiding the states. It was the invocation of the limitations of the Offset Ruling, which followed only from effective § 7407(d) designations.

■ In short the Agency has simply failed to show strong enough reason to invoke the § 553(b)(B) exception. This exception should be read narrowly. *American Iron and Steel Institute v. EPA, supra,* 568 F.2d at 292. It is an important safety valve to be used where delay would do real harm.[15] It should not be used, however, to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them.

■ EPA argues that even if it was obliged to afford opportunity for § 553 notice and comment before making the designations, its failure to do so was cured by its acceptance of comments after the effective date. The argument mixes notions of mootness, harmless error, and minimal injury to petitioners. While the substantial public health interests involved give these arguments some surface appeal, accepting them would lead in the long run to depriving parties affected by agency action of any way to enforce their § 553 rights to pre-promulgation notice and comment.

■ Essentially the argument is that despite its lack of literal compliance with § 553 the EPA satisfied the intent of § 553 by accepting post-promulgation comments and keeping an open mind about revisions. The EPA overlooks, however, the crucial difference between comments before and after rule promulgation. Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas. Other courts have recognized this difference and rejected arguments similar to that asserted here:

> Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way. . . . "We doubt that persons would bother to submit their views or that the Secretary would seri-

---

sions completed. We therefore read § 7407(d)(4) as saying that after February 3, 1978, an unclassified area will be deemed a § 7407(d)(1)(D) area until an effective designation is made. Thus it is no bar to EPA redesignation on remand.

15. Use of the exception has repeatedly been approved, for example, in cases involving government price controls, because of the market distortions caused by the announcement of future controls. *See De Rieux v. Five Smiths,*

*Inc.,* 499 F.2d 1321, 1332 (TECA), *cert. denied,* 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *Nader v. Sawhill,* 514 F.2d 1064, 1068 (TECA 1975). The exception was also held applicable to regulations concerning gas stations, where temporary shortages and discriminatory practices were found to have deprived some users of any supply and led to violence. *Reeves v. Simon,* 507 F.2d 455, 458–59 (TECA 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975).

ously consider their suggestions after the regulations are a *fait accompli*." *City of New York v. Diamond*, 379 F.Supp. 503, 517 (S.D.N.Y.1974), *quoting Kelly v. Department of Labor*, 339 F.Supp. 1095, 1101 (E.D.Cal.1972). Similar conclusions were reached in *Maryland v. EPA*, 530 F.2d 215, 222 (CA4, 1975), *vacated on other grounds sub nom. EPA v. Brown*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), and *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013, 1020 (CA3, 1972). The case at hand does not differ from these in any significant way. Were we to allow the EPA to prevail on this point we would make the provisions of § 553 virtually unenforceable. An agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a reviewing court could act.

The EPA's position is not advanced by its assertions that the § 7407(d) designations are but the first step in an extended process and have little impact on petitioners. As we have discussed above, the designations have collateral effects that pose significant and immediate problems for petitioners. These continuing effects make the validity of the designations a live issue.

 Nor can the Agency rest on the doctrine of harmless error. While that doctrine has been held applicable to review of agency actions, and has statutory sanction in the APA,[16] it is to be used only "when a mistake of the administrative body is one

that clearly had no bearing on the procedure used or the substance of decision reached." *Braniff Airways v. CAB*, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967). Here the Agency's error plainly affected the procedure used, and we cannot assume that there was no prejudice to petitioners. Absence of such prejudice must be clear for harmless error to be applicable. *See Alabama Ass'n of Insurance Agents v. Board of Governors of the Federal Reserve System*, 533 F.2d 224, 236 (CA5, 1976), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978); *Unification Church v. Attorney General for the U. S.*, 189 U.S. App.D.C. 92, 94–95, 581 F.2d 870, 872–73, *cert. denied*, —— U.S. ——, 99 S.Ct. 102, 58 L.Ed.2d 122 (1978); *Haltmier v. Commodity Futures Trading Comm'n*, 554 F.2d 556, 562 (CA2, 1977).

### Procedures on Remand

We turn now to the problem of the timing of procedures on remand. While the EPA and the AAPCC must abide by the procedural requirements of the Clean Air Act and the APA, they must also act expeditiously in order to fulfill Congress' principal goal of attaining the primary air quality standards by the end of 1982.

 The first procedure on remand will be a reconsideration of the designations by the EPA.[17] The EPA must give notice of the proposed designation and allow comment in accordance with § 553.[18]

---

**16.** 5 U.S.C. § 706, provides that in judicial review of agency actions, "due account shall be taken of the rule of prejudicial error." Although the judicial review provisions of the APA have been held not strictly applicable to direct review in the courts of appeals, *Natural Resources Defense Council v. NRC*, 539 F.2d 824, 837 (CA2, 1976), *vacated on other grounds*, 434 U.S. 1030, 98 S.Ct. 760, 54 L.Ed.2d 777 (1978), we nevertheless find this principle applicable.

**17.** There is no need for the AAPCC to reconsider its initial designation list, since we see no indication of procedural error on its part. We reject petitioner Republic Steel's contention that the AAPCC was required by 42 U.S.C. § 7410(a)(2) to hold public hearings prior to its

designation. That section and the regulation implementing it, 40 C.F.R. § 51.4(a)(1), require hearings for proposed implementation plans, revisions to those plans, and compliance schedules. The mere fact that the nonattainment designations are a preliminary step toward an SIP revision does not bring the hearing requirement of § 7410(a)(2) into play.

**18.** U.S. Steel also claims that the EPA rule making procedures set forth in 42 U.S.C. § 7607(d) apply to § 7407(d) designations. It cites no authority for this proposition, and such designations are plainly not among the actions enumerated in § 7607(d). Its provisions are not applicable, and on remand the Agency need only satisfy the requirements of 5 U.S.C. § 553.

A more difficult question is that of the required timing of the SIP revision. The 1977 Amendments set out in detail when required actions of state pollution authorities must be taken. Section 406(d)(2), 91 Stat. 796 (uncodified), provides generally that SIP revisions made necessary by the Amendments are to be made within one year of the Amendments' effective date or within nine months of EPA promulgation of any pertinent regulation. However, the Amendments also specifically required that all states in which there is any nonattainment area submit SIP revisions satisfying the Amendments' nonattainment provisions [19] by January 1, 1979. Section 129(c), 91 Stat. 750–51 (uncodified).

Since it is impossible for the Alabama SIP to be submitted by January 1, 1979, the general provision of § 406(d)(2) should apply. Thus the AAPCC will have nine months [20] after final EPA promulgation of the nonattainment list to revise and submit its plan. During this time the state must hold public hearings pursuant to 42 U.S.C. § 7410(a)(2). The EPA must then approve or disapprove the plan within four months of the date of submission. *Id.*

Remand will predictably delay beyond July 1, 1979, adoption of revisions of the Alabama SIP dealing with the areas in question as nonattainment areas. The EPA has indicated that there could be dire consequences from delaying the SIP revisions beyond July 1 and at least implies that the statute may require a moratorium on all new construction in the areas.[21] This issue of whether a moratorium on new construction is required has not been briefed, and we approach it with reluctance. Nevertheless, time and certainty are important and further delays by litigation undesirable. Therefore, we address the moratorium point.

The only part of the Act that arguably calls for a moratorium on new construction in these circumstances is § 7502(a)(1). That section provides:

> The provisions of an applicable implementation plan for a State relating to attainment and maintenance of national ambient air quality standards in any nonattainment area which are required by section 7410(a)(2)(I) of this title as a precondition for the construction or modification of any major stationary source in any such area on or after July 1, 1979, shall provide for attainment of each such national ambient air quality standard in each such area as expeditiously as practicable, but, in the case of national primary ambient air quality standards, not later than December 31, 1982.

The language of this section evinces a desire to prevent construction in nonattainment areas except in accordance with a plan whose provisions conform to the statute.[22] This desire is a borne out by the section's legislative history.[23] But the lan-

19. These provisions, 42 U.S.C. §§ 7501–7508, constituting Part D of Title I of the Act, were added by § 129(b) of the Amendments, 91 Stat. 745–50.

20. We do not decide whether under the circumstances EPA can prescribe a reasonable period of less than nine months. In any event, it may well be possible that AAPCC will not need the full nine months.

21. In the September 11, 1978 repromulgation of the nonattainment list, the EPA stated that for any designated nonattainment area without an adequate approved or promulgated nonattainment plan, the conditions of the Emission Offsets Interpretative Ruling will be replaced with a ban on new construction after June 30, 1979, when the requirements of State nonattainment plans are to be in effect.

> The ban on construction will apply to any major new source or major modification that will cause or significantly contribute to an air quality violation within the nonattainment area.

At oral argument, counsel for the EPA stated that unless a plan is approved by July 1, a state will "be subject to very severe growth and economic limitations."

22. The detailed restrictions on this part of the SIP are contained in §§ 7502(b) and 7503.

23. The Conference Report section describing § 129 of the Amendments (which enacted 42 U.S.C. §§ 7501–7508) stated that "[a]s a condition for permitting major new sources to locate in a nonattainment area, States are required to have approved revised implementation plans." H.Conf.Rept. 95–564 at 157. The report then goes on to describe the required provisions of

guage does not purport to add any substantive conditions or add any sanctions. It simply refers to the provisions "required by section 7410(a)(2)(I) . . . as a precondition." We must therefore look to § 7410 to see how Congress sought to effectuate its intent.

Section 7410 requires the states to submit implementation plans and sets out in detail requirements for those plans. It is applicable to the entire plan, not merely to the provisions regarding nonattainment areas. Section 7410(a)(2) calls for action by the Administrator of EPA approving or disapproving submitted SIP provisions. This subsection lists several requirements that the plan must meet to be acceptable for EPA approval. Among these is § 7410(a)(2)(I), which requires that a plan forbid any construction of new emission sources in a nonattainment area except for those approved in accordance with the permit program described in § 7503. Section 7410(c)(1) indicates what the primary sanction is when a state fails to submit a plan acceptable under § 7410(a)(2). Such failure allows the EPA to promulgate a plan for the state.[24] This provision would have allowed EPA to have taken over the SIP development had Alabama simply failed to do so.

This discussion of § 7410 reveals two points, we think. First, we need not read the vague language of § 7502 as imposing any sort of moratorium in order to effectuate the intent of Congress. The provisions of § 7410(c)(1) give EPA an effective means to deal with intransigence at the state level. Second, Congress has consistently invoked sanctions against the states only where they have failed to take timely action as required by statute. While the original statutory

deadline for submission of the SIP revisions was January 1, 1979, the EPA's improper procedure has made that impossible. Until Alabama submits its SIP revisions, EPA does not have authority to prevent all construction or otherwise supplant the state's role in this process.

This is not to say that new construction may proceed without limit, however. As indicated above there are two sources of authority for EPA enforcement action to block construction in a nonattainment area. One is § 7413(a)(1), which permits the EPA to enjoin any action taken in violation of the SIP. Until the SIP, with its required § 7503 permit program, is promulgated, § 7413(a)(1) cannot provide the basis of enforcement. The other relevant provisions are §§ 7413(a)(5) and 7413(b)(5), which allow the EPA to halt construction commenced in violation of the Offset Ruling, as enacted by § 129(a)(1) of the Amendments. But since § 129(a) by its terms is effective only through June 30, 1979, it may be argued that the EPA will have no enforcement authority at all in this area between July 1, 1979, and final promulgation of the Alabama SIP.

Certainly unchecked new construction in designated nonattainment areas[25] will no more effectuate the intent of Congress than would a total moratorium. For that intent was "to allow reasonable economic growth to continue in an area while making reasonable further progress to assume attainment of the standards by a fixed date." H.Rept. 95–224 at 211. To resolve this problem we must look to the entirety of § 129 of the Amendments. That section deals comprehensively with the problem of nonattainment areas: § 129(b) sets out in detail the

---

the plan. This passage does not alter, however, our reading of § 7502(a) in its context in the Act.

**24.** Specifically, § 7410(c)(1) instructs the EPA to promulgate a plan within six months of the time by which the state should have submitted one. This provision coincides with the intended timetable for action on the nonattainment SIP revisions. They were originally due from the states on January 1, 1979. Whatever sanctions might have been intended by § 7410 or

§ 7502 were not to be effective until July 1, 1979.

**25.** Clearly there can be no restrictions on construction under any of these provisions until there is an effective § 7407(d) designation. However, it appears likely that there will be such a designation shortly, and that there will be a substantial period of time between that time and promulgation of the Alabama SIP.

provisions to be made by the SIP; § 129(c) required submission of the SIP by January 1, 1979; and § 129(a) provided for interim provisions (those of the Offset Ruling) to be effective through June 30, 1979. The plain intent of the section is that at all times after a § 7407(d) designation the provisions of the Offset Ruling or the substantially similar provisions of § 7503 would apply. The scheme was based on the premise that the SIP revisions would be completed on time. While that premise has turned out not to be true, we hold that to carry out the statutory purpose EPA may enforce the Offset Ruling as enacted in § 129(a) from and after the time that a § 7407(d) designation is made and until such time as SIP revisions consistent with § 7503 are adopted.

The petitions to set aside the § 7407(d) designations are GRANTED, and the cause is REMANDED to the Environmental Protection Agency for new proceedings consistent with this opinion.