622 F.2d 260
 14 ERC 1620, 10 Envtl. L. Rep. 20,363
 McCOY-ELKHORN COAL CORPORATION, Plaintiff-Appellant,
and
Ohio Edison Company, Intervening-Plaintiff-Appellant,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY et al.,
Defendants-Appellees,
and
State of Ohio et al., and United Mine Workers of America,
District 6, Intervening Defendants-Appellees.
 Nos. 79-3326, 79-3327 and 79-3398.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 15, 1979.
Decided June 2, 1980.
 
 James Park, Jr., Stoll, Keenon & Park, Katherine Randall, William L. Montague, Lexington, Ky., Donald H. Vish, Gen. Counsel, McCoy-Elkhorn Coal Corp., Lexington, Ky., for McCoy-Elkhorn Coal Corp.
 Patrick H. Molloy, U. S. Atty., Lexington, Ky., for E.P.A. and Costle.
 Stephen D. Ramsey, U. S. Dept. of Justice, Land & Natural Resources Div., Pollution Control Section, Washington, D.C., General Counsel's Office, E.P.A., Washington, D.C., Michael R. Dowling, Ashland, Ky., Joel S. Taylor, David E. Northrop, Asst. Attys. Gen., Frank Pierce, Gen. Counsel, United Mine Workers of America, District 6, Shadyside, Ohio, James W. Moorman, Robert L. Klarquist, Maryann Walsh, Dept. of Justice, Land & Natural Resources Div., Appellate Section, Washington, D.C., for defendants-appellees and intervening defendants-appellees.
 William H. Cull, Deputy Gen. Counsel, Frankfort, Ky., for amicus Gov. Carroll.
 Carl D. Perkins, Ashley, Perkins & Slack, Washington, D.C., for amici curiae Members of Congress.
 Lowell T. Hughes, Van Antwerp, Hughes, Monge & Jones, Ashland, Ky., Russell J. Spetrino, Ohio Edison Company, Akron, Ohio, J. Jeffrey McNealey, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Ohio Edison Co.
 Before EDWARDS, Chief Judge, and ENGEL and JONES, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 Appellants attack Section 125 of the Clean Air Act, as amended, 42 U.S.C. § 7425, as unconstitutional on its face. The district court upheld the constitutionality of the statute under the Commerce Clause and the Due Process Clause of the Fifth Amendment. We affirm.
 
 
 2
 Section 125 of the Clean Air Act, as amended, authorizes the President or his designee[1] to "prohibit (a) major fuel burning stationary source . . . from using fuels other than locally or regionally available coal" when considered "necessary to prevent or minimize significant local or regional economic disruption or unemployment." The statute applies only to major fuel burning stationary sources which have the capacity to produce 250,000,000 BTUs per hour and which are not in compliance with the state implementation plan. The statute empowers the Administrator of the Environmental Protection Agency (EPA) to define the locale or region. If action under Section 125 is deemed necessary, the affected purchasers of coal must enter into long-term contracts for supply of locally or regionally available coal. Only companies not yet in compliance with EPA standards can be affected by orders under Section 125.
 
 
 3
 The EPA implementation plan for Ohio specifies two ways by which companies can comply with the sulfur dioxide standards: 1) burn low sulfur fuel, including blended or washed coal or 2) use flue gas desulfurization (scrubbers). Every Ohio utility chose the less expensive low sulfur option. Section 125, if invoked, would eliminate the low sulfur coal option for companies in areas producing high sulfur coal.
 
 
 4
 On December 28, 1978, EPA proposed to invoke Section 125 in order to prohibit Ohio utility companies from burning coal not locally or regionally available. 43 Fed.Reg. 60652. The proposed determination would require Ohio utilities not yet in compliance with the applicable environmental standards to purchase high sulfur coal rather than low sulfur coal. To comply with environmental standards, the utility companies would be compelled to install scrubbers.
 
 
 5
 Shortly after the EPA's proposed determination, McCoy-Elkhorn Coal Corporation, a Kentucky producer of low sulfur coal, filed a complaint against the EPA and its Administrator in the district court. McCoy-Elkhorn alleged that Section 125 violates the Commerce Clause and the Due Process Clause of the Fifth Amendment. It sought declaratory and injunctive relief.
 
 
 6
 Ohio Edison Company was granted permission under Rule 24(b), Fed.R.Civ.P., to intervene as a plaintiff. Ohio Edison is an Ohio utility not yet in compliance with the state implementation plan. In 1977, Ohio Edison elected to burn low sulfur coal instead of installing scrubbers in order to comply with environmental standards. Under federal regulations, Ohio Edison was required to be in compliance no later than October 19, 1979. If Ohio Edison had chosen to install scrubbers, the deadline date would have been June 13, 1980.
 
 
 7
 The State of Ohio, Governor of Ohio and United Mine Workers, District 6, were granted permission to intervene as defendants. All three parties had petitioned the EPA to institute proceedings pursuant to Section 125 in order to protect the Ohio high sulfur coal industry. They acted soon after this Court upheld the validity of the sulfur dioxide emission standards. Cincinnati Gas & Elec. Co. v. EPA, 578 F.2d 660 (6th Cir. 1978), cert. denied, 439 U.S. 1114, 99 S.Ct. 1017, 59 L.Ed.2d 72 (1979); Cleveland Electric Illuminating Co. v. EPA, 572 F.2d 1150 (6th Cir.), cert. denied, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978).
 
 
 8
 The district court entered its order sustaining Section 125 on May 7, 1979. On August 30, 1979, the EPA issued a reproposed determination under Section 125. The EPA now proposes to find the local and regional economic disruption from Ohio utilities switching to low sulfur coal insufficient to warrant action under Section 125. To date the EPA has not issued a final rule, though the extended period for comment on the reproposed determination expired on February 20, 1980. 45 Fed.Reg. 2893 (January 15, 1980).
 
 I. JUSTICIABILITY
 
 9
 Before addressing the merits of this appeal, we must discuss the difficult problems of standing, ripeness and mootness. To have standing, plaintiffs must demonstrate identifiable injuries in fact to themselves and a substantial likelihood that judicial relief would redress their injuries. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Plaintiffs must prove either an actual injury or a real and immediate threat of injury resulting from the enforcement of Section 125. O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). Because McCoy-Elkhorn has suffered economic harm from a constriction of its market caused by Section 125, it therefore does have standing. Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).
 
 
 10
 At trial McCoy-Elkhorn sought to substantiate its general allegation of injury to its market for customers.[2] Ohio is and has been a large and natural market for McCoy-Elkhorn. The testimony disclosed one set of negotiations in Ohio with the Cleveland Electric Illuminating Company (CEI). McCoy-Elkhorn had never sold coal to CEI before and the negotiations were in the preliminary stages. Witnesses testified that the threat from the Section 125 proceedings was a factor in the breakdown of the negotiations, though many other factors may have been the cause. Apparently on the basis of this testimony, the district court found that McCoy-Elkhorn "has shown an immediate impediment and a greater threatened impairment to its ability to do business in Ohio directly attributable to Section 125 of the Act." Therefore, the district court held that McCoy-Elkhorn presented a case or controversy under Article III, Section 2 of the Constitution. The finding of business injury to McCoy-Elkhorn is not clearly erroneous.
 
 
 11
 At the time of trial, the EPA had issued a proposed determination to use Section 125, but had not yet defined the exact region. Though the district court determined that the injury to McCoy-Elkhorn was "directly attributable to Section 125," we note that McCoy-Elkorn did not file its complaint until after the proposed determination by the EPA. The district court did not discuss the significance for purposes of standing of the pending proposed determination.
 
 
 12
 We must consider the effect of the reproposed determination by the EPA on the standing of McCoy-Elkhorn. The business injury to McCoy-Elkhorn arises from the threat of Section 125 and is increased by the initiation of Section 125 proceedings. Though the reproposed determination lessens the immediate threat, the threat nevertheless remains until the EPA issues a favorable final rule.
 
 
 13
 McCoy-Elkhorn will continue to suffer a restricted business market at least as long as the Section 125 proceedings are pending. A decision in favor of appellant would redress its alleged injuries by removing a significant impediment to McCoy-Elkhorn's ability to sell its coal in Ohio. See Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261-64, 97 S.Ct. 555, 561-62, 50 L.Ed.2d 450 (1977). Therefore, at this time, the injury to McCoy-Elkhorn is sufficiently real and immediate to accord standing.[3]
 
 
 14
 Ripeness is a less difficult question than standing. The ripeness doctrine was developed in the context of judicial review of administrative agency action. E. g., Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It has been applied in cases concerning facial attacks on the constitutionality of a statute. Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. at 81-82, 98 S.Ct. at 2635. Ripeness calls for a common sense judgment on the fitness of the issues for judicial review and the actual hardship to the parties if a court decision were withheld. Poe v. Ullman, 367 U.S. 497, 508, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); Diamond Shamrock Corp. v. Costle, 580 F.2d 670, 675 (D.C.Cir.1978).
 
 
 15
 We are persuaded that the ripeness standard has been met here. Because this appeal raises a facial attack on the constitutionality of the statute and presents a purely legal question, we will never be in a better position to decide the issues. 438 U.S. at 82, 98 S.Ct. 2635; Nixon v. Administrator of GSA, 433 U.S. 425, 439, 97 S.Ct. 2777, 2788, 53 L.Ed.2d 867 (1977). Also, there is no requirement of exhausting administrative remedies. In addition to the foregoing considerations is the reality that deferring resolution of the constitutionality of Section 125 until a later time would adversely affect the parties and the public. McCoy-Elkhorn would suffer from continued loss of business opportunity. Ohio Edison would risk the loss of substantial financial investments and would face potential civil penalties for noncompliance, because it cannot install scrubbers by the compliance deadline date. See United States Steel Corp. v. EPA, 595 F.2d 207 (5th Cir. 1979); Association of Bituminous Contractors v. Andrews, 581 F.2d 853 (D.C.Cir.1978). Unlike the situation in Bethlehem Steel Corp. v. EPA, 536 F.2d 156 (7th Cir. 1976), their injuries are not merely speculative, but affect primary conduct such as negotiating contracts. Resolution is also necessary because of the potential impact of Section 125 on the coal industry and on obtaining expeditious compliance with the EPA sulfur dioxide standards. Undeniably the issue could be raised in a later proceeding. However, a decision now will avoid a waste of judicial resources and will not interfere with EPA proceedings on questions over which it has initial discretion.
 
 
 16
 Because the EPA has not issued a final rule on Section 125, we hold that this appeal is not moot. Though the reproposed determination favors appellants, we note that the EPA changed its position in the past.
 
 II. COMMERCE CLAUSE
 
 17
 We hold that Section 125 is constitutional on its face. Because the EPA has not issued a final rule under Section 125, we are not concerned at this time with the constitutionality of the statute as applied or with judicial review of agency action.
 
 
 18
 Appellants contend that Section 125 violates the Commerce Clause by creating a discriminatory trade barrier around a state or states.[4] Though recognizing the broad power of Congress to place restrictions or conditions on interstate commerce, appellants argue that Congress cannot contravene the principle of free trade among the states which is embodied in the Commerce Clause. Appellants would have us apply to Congress the limitations imposed by the Commerce Clause on the states.
 
 
 19
 It cannot be disputed that the Commerce Clause establishes a free flow of trade among the states. Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). While the Commerce Clause prohibits a state from enacting legislation which discriminates against the trade of other states, no decision has applied to Congress the prohibition on the states against discriminatory legislation.
 
 
 20
 Since Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 6 L.Ed. 23 (1824), it has been held uniformly that the plenary power of Congress to regulate commerce is restricted only by express limitations found in other provisions of the Constitution. E. g., United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Therefore, our review of Congressional legislation under the Commerce Clause itself is limited to whether the regulated activity is in the stream of interstate commerce and whether the means adopted by Congress to regulate commerce are appropriate for the purpose of the legislation. Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Darby, 312 U.S. at 114, 121, 61 S.Ct. at 457, 460. We cannot substitute our views on the wisdom of the legislation for those held by Congress. Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 606, 70 S.Ct. 403, 404, 94 L.Ed. 381 (1950).
 
 
 21
 It is beyond question that the sale of coal or other energy sources is in the stream of interstate commerce. Therefore, Congress clearly has the power to regulate coal purchases. It is inconsequential for purposes of the Commerce Clause that the Act may be applied only to one region of the country at any given time and that a region may include only one state. Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. at 616, 70 S.Ct. at 409; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). The Commerce Clause does not require nationally uniform regulation. United States v. Buckeye Steamship Co., 287 F.2d 679 (6th Cir. 1961).
 
 
 22
 In Section 125 Congress has chosen a means of regulation that has harsh effects on the purchasers of coal and on coal companies. Congress possesses the power to prohibit goods from interstate commerce because of their detrimental effect on the economy, United States v. Darby, 312 U.S. at 114, 61 S.Ct. at 457, to establish quotas on production, Wickard v. Filburn, 317 U.S. at 124, 63 S.Ct. at 88, to set quotas on sales, Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. at 616, 70 S.Ct. at 409, and to prohibit certain forms of business operations or corporate structure, North American Co. v. SEC, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945 (1946). The purpose of Section 125 is to give relief to areas suffering from significant economic disruption caused by environmental regulations. Section 125(b) would accord relief to the areas hurt by high unemployment. Though Congress could have chosen other less stringent means, restrictions imposed on purchasing companies are appropriate for the purpose of the legislation. It does not matter that some coal producers will be harmed by the use of Section 125. The balance of benefit and harm is a policy judgment confined to the discretion of Congress. Wickard v. Filburn, 317 U.S. at 129, 63 S.Ct. at 91. Section 125 merely removes an unnatural benefit to McCoy-Elkhorn and Ohio Edison which was created by prior legislation and regulation. Therefore, we hold that Section 125 withstands attack under the Commerce Clause.
 
 III. FIFTH AMENDMENT
 
 23
 Appellants contend that Section 125 contravenes the Due Process Clause of the Fifth Amendment. Their argument rests on the equal protection principle which has been incorporated into the Fifth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). McCoy-Elkhorn argues that the classification of coal producers by Section 125 into regional producers and nonregional producers must be justified by a compelling national interest, because the statute impairs the fundamental right to travel. It also argues that Section 125 is not rationally related to any legitimate governmental interest. Ohio Edison does not argue for strict scrutiny of the statute. Instead Ohio Edison contends that the statutory classification, which provides economic security for regional coal producers at the expense of nonregional coal producers, is not rationally related to the purposes of the Clean Air Act.
 
 
 24
 Section 125 must be sustained if the classification of coal producers is rationally related to a legitimate governmental interest. United States Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). Strict scrutiny of the statute here is not appropriate, for the fundamental right to travel is a personal liberty interest that has not yet been extended to protect the interstate sale of goods.
 
 
 25
 Appellants argue that Section 125 is not related to the environmental purposes of the Clean Air Act. However, Congress did not enact Section 125 in response to environmental problems. Rather Congress was concerned with the potential economic hardship which could be inflicted on regions by the Clean Air Act. Because Section 125 was proposed during floor debates, we do not have the benefit of committee hearings or reports which make findings of facts or clearly state Congressional reasoning. During floor debates, several Senators stated reasons for enacting Section 125, including the protection of the economic well-being of regions producing high sulfur coal and the obtaining of an effective utilization of our nation's energy resources. 123 Cong.Rec.S. 9449 (daily ed. June 10, 1977). These reasons are legitimate governmental purposes. We will not inquire into the motives of individual legislators for proposing and voting in favor of Section 125.
 
 
 26
 Other means could have been chosen which would be more harmonious with preserving and promoting free trade among the states. However, Section 125 is effectively designed both to foster the economic well-being of regions producing high sulfur coal and to utilize coal resources in a manner considered efficient by Congress. Therefore, Section 125 does not contravene the equal protection principle incorporated in the Due Process Clause of the Fifth Amendment.
 
 
 27
 Ohio Edison contends that the application of Section 125 to its business would result in a taking of its property without just compensation in violation of the Fifth Amendment. Because this appeal concerns only a facial attack on the constitutionality of Section 125, we do not consider Ohio Edison's challenge to the constitutionality of Section 125 as applied.
 
 
 28
 Accordingly, the judgment of the district court is affirmed.
 
 
 
 [1]
 Congress removed the power originally granted to the Governor of a state to issue a prohibitory order under Section 125. 42 U.S.C. § 6215
 
 
 [2]
 McCoy-Elkhorn alleged in its complaint that a long-term contract to supply low sulfur coal to Dayton Power and Light Company was threatened by the Section 125 proceedings. However, at the hearings before the district court, McCoy-Elkhorn conceded that its contract with Dayton Power was not in danger
 
 
 [3]
 The district court did not make findings of fact on the standing of intervening plaintiff Ohio Edison. Because we affirm the standing of McCoy-Elkhorn, we need not address the standing of Ohio Edison
 
 
 [4]
 The EPA Administrator has the authority under Section 125 to define the affected region. Obviously this determination turns on the facts. A region could include several states or merely part of one state. The size of the region is inconsequential for this appeal on the facial validity of Section 125. We do not decide this case on the basis of the EPA proposed determination which apparently would have defined the affected region to include the Southeastern counties in Ohio