Peter C. KATT, Plaintiff–Appellant,

v.

David DYKHOUSE, Michigan Commissioner of Insurance and Frank J. Kelley, Attorney General of Michigan, Defendants–Appellees.

No. 92–1187.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1992.

Decided Nov. 23, 1992 *.

---

* This decision was originally issued as an "unpublished decision" filed on November 23, 1992. On December 17, 1992, the court designated the opinion as one recommended for full-text publication.

Paul R.Q. Wolfson (argued and briefed), Public Citizen Litigation Group, Washington, DC, for plaintiff-appellant.

Harry G. Iwasko, Jr., E. John Blanchard, Asst. Atty. Gen. (argued and briefed), Lansing, MI, for defendants-appellees.

Before: GUY and BATCHELDER, Circuit Judges; and LIVELY, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

The plaintiff, a financial planner, filed this First Amendment action after the Michigan Insurance Commissioner declared that Michigan law bars the plaintiff from providing his clients with certain information concerning the availability of life insurance commission rebates in Florida. The district court held that the First Amendment claim is barred by *res judicata* because the plaintiff could have advanced it during an earlier state court action in which he challenged the provisions of the statute that bar him from offering such rebates in Michigan. We find that the plaintiff's First Amendment claim was not ripe during the state court action and is therefore not barred by *res judicata*. Accordingly, we reverse and remand.

## I.

The plaintiff, Peter Katt, is a licensed financial planner who counsels his clients on insurance and investment strategy. Katt resides and maintains an office in Michigan and is licensed by the state as a life insurance counselor and agent. He also holds a Florida license as a non-resident life insurance agent.

Katt charges his clients a flat hourly fee for his time. Thus, when Katt discusses life insurance with a client, Katt is compensated even if the client elects not to purchase insurance or decides to use another agent. If the client decides to purchase life insurance through Katt, Katt charges an hourly fee for the time spent preparing the application.

When Katt prepares a life insurance application for a client, he generally receives a commission if the company issues the policy. Since Katt operates on a fee-for-service basis, he would prefer to rebate the commission back to the client.[1] However, Katt does not do so because Michigan law forbids an insurance agent from rebating any portion of his or her commissions. Mich.Comp.Laws.Ann. §§ 500.2024, 500.-2066(1).

By contrast, rebating has been legal in Florida since 1986. In that year, the Flori-

---

1. Katt states that he sometimes recommends that his clients purchase insurance from one of two companies that do not pay commissions to agents. When these no-commission companies cannot provide a client with suitable coverage, Katt is forced to recommend a commission-paying company.

da Supreme Court held that Florida's anti-rebating statute violated the due process clause of the state constitution. *Department of Ins. v. Dade County Consumer Advocate's Office*, 492 So.2d 1032 (Fla. 1986).

Shortly after learning of the Florida decision, Katt contacted the Michigan Insurance Bureau ("the Bureau") to inquire whether he could advise his clients to travel to Florida to purchase insurance. Specifically, Katt proposed to tell his clients that he was willing to travel to Florida at the client's expense to sell them insurance and rebate the commissions. Alternatively, Katt proposed to give his clients the names of other Florida insurance agents who would rebate the commissions.

In February 1987, Katt outlined his proposal in a telephone conversation with William LaRue, the Bureau's Director of Compliance. LaRue advised Katt that his plan would not violate Michigan law. Katt confirmed this conversation with a follow-up letter to LaRue.

Katt then circulated a newsletter to accountants and attorneys advising them that he could offer his "Florida plan" to their clients. After receiving complaints from other insurance agents, the Bureau undertook an investigation. During the investigation, Katt twice spoke to investigators who assured him that his conduct did not violate Michigan law. The Bureau did not take any action against Katt.

In late 1987, Katt filed an action for declaratory judgment in Ingham County Circuit Court against the Bureau and the Commissioner of Insurance. Katt sought a declaration that Michigan's anti-rebating statute violated the due process clause of the state constitution. Katt's complaint did not state a First Amendment claim and did not raise any issue concerning the legality of his Florida plan. Instead, Katt's challenge was exclusively concerned with the legality of rebates in Michigan.

The Bureau and the Commissioner filed a motion to dismiss the state court action. In support of that motion, the Bureau and the Commissioner produced an affidavit from Frank Baker, director of the Bureau's Licensing and Investigation Division. In his affidavit, Baker stated that Katt's Florida plan did not violate Michigan law and that, therefore, the Bureau did not contemplate any action against him.

The state court judge remanded the case so that Katt could obtain a declaratory ruling from the Commissioner as to whether the anti-rebate statutes applied "with respect to the issues raised in this case." Katt therefore submitted a request for a declaratory ruling to the Commissioner as to whether he could give his clients rebates in Michigan. In his formal ruling, the Commissioner responded that Michigan law forbids such rebating. In a footnote, the Commissioner observed that Katt offered his clients rebates in Florida, but did not address the legality of that conduct.

The case then returned to the state court. In July 1990, the state court reached the merits of Katt's state due process challenge and upheld the anti-rebating statute. Katt filed a timely appeal, and that appeal is currently pending before the Michigan Court of Appeals.

Five days after the state court entered judgment against Katt, the Bureau sent Katt a letter warning him that his Florida plan violated Michigan law. Katt immediately responded by writing a letter to the Bureau, in which he pointed out that the Bureau's officials had assured him that his offers to sell in Florida did not violate Michigan law. Katt voluntarily suspended his Florida program and requested a formal declaratory ruling from the Commissioner.

In his second declaratory ruling, the Commissioner ruled that Katt could not offer in Michigan to rebate his commission even if the proposed transaction would take place in Florida. The Commissioner affirmed that Katt could sell policies with rebates in Florida and could accept a request to do so from a Michigan client if the client initiated the request and if the arrangements were made outside of Michigan. The Commissioner also ruled that Katt could not give details about the size, terms, or availability of Florida rebates to Michigan clients while in Michigan. Fur-

ther, the Commissioner ruled that Katt could not give Michigan clients the names of Florida agents willing to give rebates even if Katt would not be compensated for this information.

In August 1991, Katt filed this action against the Commissioner and the Michigan Attorney General in the district court. His complaint alleges that the Commissioner's interpretation of Michigan's anti-rebating statute violates his First Amendment right to inform his clients about rebating in Florida. Katt does not challenge the provisions of the statute that bar him from giving rebates in Michigan.

The defendants moved to dismiss Katt's complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). The defendants argued that the matter is *res judicata* because Katt should have raised his First Amendment claim in his state court action. Alternatively, the defendants maintained that Katt had failed to state a First Amendment claim because his proposed speech concerns illegal activity.

After a hearing, the district court concluded that Katt should have brought his First Amendment claim in his state court lawsuit. Therefore, the court dismissed his federal action as *res judicata* and did not reach the defendants' alternate ground for dismissal. Katt then filed this appeal.

## II.

The Full Faith and Credit Clause, U.S. Const., Art. IV, § 1, as implemented by the federal full faith and credit statute, 28 U.S.C. § 1738, requires federal courts to give preclusive effect to state court judgments. The Supreme Court has repeatedly held that § 1738 requires a federal court to give the same effect to a state court judgment that would be given by a court of the state from which the judgment emerged. *See, e.g., Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). Therefore, the preclusive effect of the state court judgment in this case must be determined by Michigan law. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984).

■ Michigan courts follow a broad application of *res judicata* to bar not only claims identical to those already litigated but also "claims arising out of the same transaction which plaintiff could have brought, but did not." *Gose v. Monroe Auto Equip. Co.,* 409 Mich. 147, 294 N.W.2d 165, 167 (1980); *see also Curry v. City of Detroit,* 394 Mich. 327, 231 N.W.2d 57, 59 (1975).

■ Katt argues that he could not have raised his First Amendment claim in his state court action because that claim did not become ripe until the Bureau threatened enforcement against his Florida plan after the state court entered final judgment against his state due process claim. This argument requires us to apply Michigan's version of the ripeness doctrine to the procedural history of this dispute.

We begin our analysis by observing that Katt's two lawsuits involve two different applications of the same statutory provisions. The state court action challenges the prohibition against rebating *in Michigan,* while the federal lawsuit challenges the Commissioner's determination that Katt cannot make certain communications concerning the availability of rebating *in Florida.* The two lawsuits do not overlap; that is, the state court action does not involve any ban on communications concerning Florida rebating, and the federal action does not challenge the ban on rebating in Michigan.

■ Under Michigan law, a constitutional challenge to a state statute is unripe unless it is clear that the state authorities intend to enforce the statute against the plaintiff. *See Department of Social Servs. v. Emmanuel Baptist Preschool,* 434 Mich. 380, 455 N.W.2d 1, 3 (1990) (First Amendment challenge to state statute requiring religious preschool to disclose financial information unripe until state exercises statutory authority); *Stockler v. Department of Treasury,* 75 Mich.App. 640, 255 N.W.2d 718, 723 (1977) (First Amendment challenge to provision allowing tax

commissioner to withhold state license unripe until commissioner acts), *appeal dismissed,* 435 U.S. 963, 98 S.Ct. 1598, 56 L.Ed.2d 54 (1978). Thus, in constitutional challenges, Michigan's ripeness doctrine parallels the federal requirement that a claimant demonstrate a genuine threat of enforcement. *See, e.g., Renne v. Geary,* — U.S. —, —, 111 S.Ct. 2331, 2339, 115 L.Ed.2d 288 (1991); *City of Houston v. Hill,* 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987); *McCoy-Elkhorn Coal Corp. v. United States E.P.A.,* 622 F.2d 260, 263 (6th Cir.1980).

At no time during the pendency of Katt's state court litigation did the Bureau or the Commissioner threaten to prosecute Katt for informing clients that they could obtain rebates in Florida. On the contrary, high-ranking officials within the Bureau repeatedly assured Katt that his Florida program did not violate Michigan law and that no enforcement actions against him were contemplated. Indeed, during the state court litigation, the *defendants* submitted an affidavit to that effect from Frank Baker, the Director of the Bureau's Licensing and Investigation Division. Katt learned for the first time that the Bureau regarded the Florida program as illegal when the Bureau wrote him five days *after* the state court had dismissed his lawsuit.

The defendants argue, however, that Katt could not rely on the assurances of the Commissioner's subordinates because only the Commissioner or a designated deputy has the power to bind the Bureau. The defendants' argument confuses estoppel with *res judicata.* Katt freely concedes that the assurances of Bureau officials do not estop the Commissioner and the Bureau from deciding to enforce the statute against him. However, those assurances are highly relevant to the question of whether there was a genuine threat of enforcement against Katt at the time the assurances were made. *See American Library Ass'n v. Barr,* 956 F.2d 1178, 1196, 1198 (D.C.Cir.1992) (finding no credible threat of statutory seizure of expressive

materials where Justice Department officials had disclaimed such seizures).

The defendants also maintain that Katt should have anticipated from the Commissioner's first adverse declaratory ruling that the Commissioner would view the Florida program as illegal. In his first ruling, the Commissioner noted that Katt was giving advice to clients about rebating in Florida, but expressly declined to state whether that activity was legal because Katt had requested a ruling only on rebating in Michigan.

Since the Commissioner's subordinates had assured Katt that his Florida program was legal and since the defendants had submitted an affidavit to that effect, the Commissioner's refusal to rule on the Florida program could not be read as a threat to enforce against it. Similarly, nothing in the Commissioner's discussion of rebating in Michigan remotely suggests that the Commissioner considered Katt's Florida program to be illegal.

We conclude that there was no credible threat of enforcement against Katt's Florida program during the pendency of his state court lawsuit. Therefore, his First Amendment claim was not ripe at that time. *Cf. City Communications, Inc. v. City of Detroit,* 888 F.2d 1081, 1089 (6th Cir.1989) (finding First Amendment claim ripe at time of earlier state court litigation and therefore barred by *res judicata* ). Accordingly, we hold that the district court erred by dismissing Katt's First Amendment claim as barred by *res judicata.*[2]

### III.

■ Since the district court dismissed Katt's action as *res judicata,* the court did not consider the defendants' alternative ground for dismissal. The defendants argued that Katt's proposed speech was wholly unprotected by the First Amendment because the speech would involve illegal activity. Katt urges us to reach the merits of this argument in the interests of

---

**2.** Our holding that Katt could not have added his First Amendment claim to his state due process claim makes unnecessary any discussion of Katt's alternative argument that the two claims arise from different transactions.

judicial economy, while the defendants maintain that we should remand this question to the district court.

"It is the general rule ... that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).[3] However, this general rule is not jurisdictional; it is a rule of procedure and practice. *Pinney Dock and Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). In *Pinney Dock*, we concluded that a departure from this general rule may be warranted when "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of this already protracted litigation." 838 F.2d at 1461.

We find that those conditions are present in this case. The parties have fully and ably briefed the defendants' alternative ground for dismissal both in the district court and on appeal. Katt filed his action more than one year ago, but discovery has not yet commenced because the district court dismissed the action on *res judicata* grounds. A remand for the district court to rule on the defendants' alternative ground for dismissal would delay the progress of this litigation even further and might lead to another appeal before discovery could begin. Therefore, we reach the merits of the defendants' alternative argument.

■ The parties agree that the information that Katt wishes to convey to his clients is commercial speech. *See Board of Trustees v. Fox*, 492 U.S. 469, 473–74, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989) (expressions that "propose a commercial transaction" are commercial speech). The parties also agree that restrictions on commercial speech must be analyzed under the four-part test announced in *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980):

For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

The defendants argue that Katt's proposed expression fails the first prong of the *Central Hudson* test because the expression concerns an activity, insurance rebating, that is unlawful in Michigan. The defendants concede that Katt's proposed speech concerns a commercial transaction that is lawful in Florida, the place where the transaction would take place. However, they maintain that the *offer* of a rebate in Michigan is itself unlawful, regardless of where the rebate is given.

We must decide, then, whether the First Amendment protects speech that proposes a transaction lawful in the place where the transaction is to occur when both the underlying transaction and the offer are unlawful in the place where the offer is made. We conclude that the First Amendment does provide such protection.

■ We begin our analysis by illustrating the type of speech that the first prong of the *Central Hudson* test clearly excludes from First Amendment protection. A state or municipality may, of course, ban a particular type of commercial transaction within its borders. Once it has done so, speech proposing or facilitating the unlawful transaction may be banned without offending the First Amendment. Thus, in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), the Supreme Court upheld a Pittsburgh ordinance that barred local newspapers from publishing sex-designated employment advertisements where the underlying

---

**3.** Of course, this general rule does not apply to alternative grounds for affirmance asserted by the party that prevailed in the district court.

*See Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970).

activity, sex discrimination in employment, was illegal in Pittsburgh.[4]

The Court reached the opposite result in a case where the underlying proposed transaction was lawful in the place where it would occur. *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). In *Bigelow*, the Court reversed the conviction of a Virginia newspaper editor who had published an advertisement from a New York abortion referral service that helped women obtain legal abortions in New York at a time when abortion was illegal in Virginia. The editor had been convicted of violating a statute making it a crime to sell or circulate publications encouraging or prompting the processing of abortions. The Court dismissed Virginia's asserted interest in protecting its citizens from certain commercial practices associated with abortion referral services:

> [This interest] would not justify a Virginia statute that forbids Virginians from using in New York the then legal services of a local New York agency. Here, Virginia is really asserting an interest in regulating what Virginians may *hear* or *read* about the New York services. It is, in effect, advancing an interest in shielding its citizens from information about activities outside Virginia's borders, activities that Virginia's police powers do not reach. This asserted interest, even if understandable, was entitled to little, if any, weight under the circumstances.

*Bigelow*, 421 U.S. at 827–28, 95 S.Ct. at 2235 (emphasis in original).

We reached a similar result in *Record Revolution No. 6, Inc. v. City of Parma*, 638 F.2d 916, 936–37 (6th Cir.1980), *vacated and remanded on other grounds*, 456 U.S. 968, 102 S.Ct. 2227, 72 L.Ed.2d 840 (1982), in which we struck down portions of several municipal drug paraphernalia ordinances that would have barred advertisements for drug paraphernalia legally available outside of city limits. We explained that

> [t]he cities' interest in regulation of advertising is limited to preventing the sale of drug paraphernalia inside their municipal boundaries. Their legitimate interest does not include regulating the information heard or read by their citizens about the availability of legal "drug paraphernalia" in other locales.

*Record Revolution*, 638 F.2d at 937 (citing *Bigelow*).[5]

The defendants contend, however, that Katt's proposal to conduct a lawful transaction in Florida does not "concern lawful activity." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. The commercial activity concerned is unlawful, the defendants contend, because Michigan law bans the *offering* and *solicitation* of an insurance rebate as well as the rebate itself.

The defendants' argument relies heavily on *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), in which the Court upheld the discipline imposed against an attorney who had attempted to solicit clients through direct, in-person contact. The defendants point

---

**4.** *Pittsburgh Press* predated by three years the Court's recognition that commercial speech enjoys limited First Amendment protection. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Therefore, the Court in *Pittsburgh Press* held that the advertisements were unprotected commercial speech. 413 U.S. at 385–87, 93 S.Ct. at 2558–60. However, the Court went on to state that even if commercial speech enjoyed protection, the advertisements would not be protected because they concerned and facilitated a commercial activity that was illegal in Pittsburgh. *Id.* at 388–89, 93 S.Ct. at 2560–61.

**5.** The Supreme Court vacated our decision in *Record Revolution* in light of its subsequent decision in *Village of Hoffman Estates v. Flip-side, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), in which the Court upheld a municipal drug paraphernalia ordinance. The Court explained that a ban on drug paraphernalia advertising did not implicate the First Amendment because such advertising promoted an underlying activity, drug use, which is illegal. *Id.* at 496, 102 S.Ct. at 1192. Thus, the Court's decision viewed the underlying commercial activity to be illegal drug use, while our decision viewed the underlying commercial activity to be the legal purchase of drug paraphernalia outside city limits. Therefore, the Court's decision to vacate our opinion in *Record Revolution* did not disturb our conclusion that a city may not ban speech describing a lawful underlying commercial activity taking place outside the city's boundaries.

out that the underlying proposed activity in *Ohralik,* the retention of counsel, was lawful and that the Court nevertheless approved a ban on the speech proposing the activity.

We find *Ohralik* to be unhelpful to the defendants' argument. Unlike this appeal, the Court's decision in *Ohralik* did not turn on the lawfulness of the underlying transaction. Instead, the Court expressly found that the attorney's conduct was "entitled to some constitutional protection," but went on to hold that the state's interests justified regulation. *Ohralik,* 436 U.S. at 459, 98 S.Ct. at 1920. If, as the defendants maintain, the attorney's speech concerned unlawful activity, the Court would have found it entitled to no constitutional protection. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351; *Pittsburgh Press,* 413 U.S. at 388–89, 93 S.Ct. at 2560–61.

We conclude that the defendants' argument is a mere tautology: Katt's offer to rebate in Florida concerns an unlawful activity because Michigan has outlawed offers to rebate. The proper inquiry under the first prong of the *Central Hudson* test is whether the *underlying* commercial transaction is lawful. If so, the speech is entitled to "some constitutional protection." *Ohralik,* 436 U.S. at 459, 98 S.Ct. at 1920.

Since rebating is permitted in Florida, Katt's proposed commercial activity is lawful. Therefore, his offers to rebate in Florida pass the first prong of the *Central Hudson* test. Accordingly, the defendants' motion to dismiss must be denied.

On remand, the defendants may be able to show, as the defendants in *Ohralik* did, that regulation of Katt's speech is justified under the remaining three prongs of the *Central Hudson* test. Since our decision today is limited to the threshold question of whether that speech concerns lawful activity, we express no opinion on the ultimate outcome of this litigation.

Accordingly, we REVERSE the district court's decision to dismiss, and REMAND to the district court for further proceedings consistent with this opinion.

BATCHELDER, Circuit Judge, concurring in the result.

I agree with the majority that the doctrine of *res judicata* does not bar the present action. I also agree that because the underlying activity at issue, making rebates of insurance premiums in Florida, is lawful activity, and because the Michigan offer to make such rebates in Florida is speech and not "activity," the first prong of the *Central Hudson* test is met. If the majority opinion had been thus limited, I would have concurred in the entire opinion. I write separately, however, because I believe the majority opinion goes beyond what is necessary for us to decide the case before us and because I do not agree with the analysis of the Michigan statute in terms of *Bigelow* and *Record Revolution.*

*Central Hudson* sets forth a four-pronged test for determining whether particular commercial speech is entitled to First Amendment protection. The majority concludes, and I agree, that as a matter of law, because the Michigan statute concerns lawful activity—namely, insurance rebates that take place in Florida—the first prong of *Central Hudson* is passed. Therefore, this case must be remanded to enable the district court to determine, under *Central Hudson,* whether the asserted government interest is substantial, whether the challenged statute directly advances this interest, and whether the statute is no more extensive than necessary to advance that interest. *See id.,* 447 U.S. at 564, 100 S.Ct. at 2350.

My difficulty with the majority opinion lies in its use of the substantial interest analysis set forth in the Supreme Court's 1975 *Bigelow* case and this court's 1980 decision in *Record Revolution* to make the unlawful activity analysis necessary to determine whether the Michigan statute passes the first prong of the *Central Hudson* test. *Bigelow* predates *Central Hudson.* However, as the excerpt from *Bigelow* quoted in the majority opinion makes clear, the Court's decision in *Bigelow* turned on the fact that Virginia did not have a substantial interest in shielding its citizens from information concerning activi-

ties in other states that were lawful in those states. *Bigelow,* 421 U.S. at 827–29, 95 S.Ct. at 2235–36. Similarly, in *Record Revolution,* which was decided after *Central Hudson,* we struck down the challenged ordinances only after concluding that the cities' legitimate interest did not extend to regulating the availability of information to their citizens concerning activity that lawfully occurred in other cities. *Record Revolution,* 638 F.2d at 937.

The lawful activity and substantial interest prongs of *Central Hudson* are analytically distinct. By applying the substantial interest analysis from *Bigelow* and *Record Revolution* to the present case as part of the lawful activity analysis, particularly in light of the majority opinion's express holding that it is limited to the threshold question of whether the regulated speech concerns lawful activity, the majority seriously blurs the distinction between the two analyses and risks obfuscating First Amendment, commercial speech jurisprudence. I would simply remand this case to the district court with instructions to determine whether Michigan may regulate Michigan offers concerning lawful Florida insurance rebates in light of the remaining three prongs of *Central Hudson.*