**HOSPITAL UNDERWRITING GROUP, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**SUMMIT HEALTH LTD., Defendant–Appellee,**

**Sarahmarge Crigler, Defendant–Appellant, Cross–Appellee.**

Nos. 93–6609, 94–5031.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1995.

Decided Aug. 29, 1995.

Rehearing Denied Sept. 19, 1995.

Jay S. Bowen (argued and briefed), Bass, Berry & Sims, Nashville, TN, for plaintiff-appellee, cross-appellant.

Ames Davis (argued), Joseph A. Woodruff (briefed), Waller, Lansden, Dortch & Davis, Nashville, TN, for defendant-appellee.

Daniel P.J. Miller (argued and briefed), Kenneth L. Tucker, Kenneth L. Tucker & Associates, Phoenix, AZ, for defendant-appellant, cross-appellee.

Before: JONES, CONTIE, and BATCHELDER, Circuit Judges.

BATCHELDER, J., delivered the opinion of the court, in which CONTIE, J., joined. JONES, J., concurred in the judgment.

BATCHELDER, Circuit Judge.

In this case of "Let's you and him fight," the trial court has been diverted from the real issues of the declaratory judgment action. Hospital Underwriting Group, Inc. ("HUG") filed this action against Summit Health Ltd. ("Summit"), seeking to establish that it has no liability under an excess insurance policy for payment of any part of a judgment in an Arizona wrongful death action, or, alternatively, that it is entitled to indemnification from Summit for any amounts that HUG may be found liable to pay. The district court held that HUG is entitled to summary judgment because, although it is liable under the excess policy, a post-judgment settlement agreement entered into in the Arizona litigation between the plaintiff in that action and Summit and its additional insureds is unreasonable, excessive and collusive and therefore is not binding on HUG.

We hold that HUG is entitled to summary judgment because it has no liability under the excess insurance policy, and that the district court's ruling that the settlement agreement is invalid must be reversed.

## I.

On Christmas Eve 1985, Oscar Crigler died of acute respiratory failure shortly after Dr. James Baumann treated him for asthma and released him from the emergency room of Mesa General Hospital ("Mesa"). Mrs. Crigler filed a wrongful death action against Mesa and Baumann in Arizona state court. Mesa is a wholly-owned subsidiary of Summit, a corporate holding company of numerous hospitals, including Mesa. Summit had its primary insurance coverage with Meridian Insurance Company ("Meridian"), and its excess coverage with HUG, a Tennessee corporation. The HUG policy provided $25 mil-

lion in coverage in excess of a $2 million deductible to Summit, hospitals owned by Summit and certain doctors working in Summit's hospitals. Mesa and Baumann were insured under the HUG policy, although they did not know of the policy until HUG denied coverage to Summit. The policy specified that "[t]he insurance afforded applies separately to each Insured against whom claim is made or suit is brought." The policy explicitly required notice as a condition precedent to coverage.[1] The policy prohibited impleader or joinder of HUG.

Summit, the "Member Insured," received a copy of the HUG policy, procedure manual and forms; the additional insureds did not. HUG did not maintain a department for handling or investigating claims. It was HUG's practice to rely on the primary carrier to provide investigation and defense of claims. Dr. Baumann had promptly notified his private medical malpractice insurance company of the Crigler claim. His carrier tendered his defense to Mesa and its carrier. Summit's primary insurance policy with Meridian covered Mesa and Dr. Baumann. Summit, Mesa and Baumann all believed that the primary coverage limit was $8 million and that the potential liability of the defendants if the jury returned an adverse verdict was in the range of $300,000—$500,000, an amount well within the primary coverage. Crigler's last pre-trial settlement demand had been for $650,000. Meridian provided a vigorous de-fense during both the pre-trial phase and the three-week trial, expending $140,000 in defense costs.

Because of turnover of Summit's employees in the group responsible for administering insurance, Summit's risk manager was unaware of possible coverage under the HUG policy until after the Arizona jury rendered its unexpectedly high verdict of $4 million in January 1988. At that point, defense counsel learned that the available primary coverage was actually $2 million rather than $8 million. Summit then investigated its files and discovered the HUG policy. Only then did Summit notify HUG of the claim and verdict, inviting HUG to intervene in the litigation and to participate in settlement negotiations and in the post-trial motions filed to attack the judgment. When it received notice of the claim and verdict, HUG reserved its rights because of Summit's failure to comply with the policy's notice requirements. A few weeks later, HUG denied coverage. HUG did not move to intervene in the Arizona litigation in the post-trial motion/appeal phase. Instead, after denying coverage, on March 28, 1988, HUG filed this declaratory judgment action against Summit, Mesa and Baumann in federal court in Tennessee.

HUG had notice that, because it had denied coverage, the parties in the Arizona

---

1. The policy specified:
 3. Insured's Duties in the Event of Occurrence, Claim or Suit:
 (A) **In the event of an occurrence (<u>even within the applicable deductible</u>) written <u>notice</u>** containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, <u>shall be given</u> **by or for the Insured to the Company** or any of its authorized agents **as soon as practicable** after any of the following have knowledge of the occurrence: ... (3) any officer located at the Member Insured's principal offices, if the Member Insured is a corporation, or (4) any person designated by the Member Insured to give such notice. The Member Insured shall designate a reasonable number of persons to give such notice....
 (B) **If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.**

 (C) The Insured shall cooperate with the Company and upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under this Policy, and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident.
 4. **Action Against Company: No action shall lie against the Company unless as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy....**
 Hospital Underwriting Group, Inc. Policy No. 85–100, Section 4.5 *Conditions*, pp. 24–26 (emphasis added).

action were negotiating a settlement. On April 20, 1988, Crigler entered into a settlement agreement with Mesa, Baumann and Summit. In exchange for payment of the $2 million immediately available from the primary insurer and an assignment from Mesa, Baumann and Summit of their rights against HUG, Crigler agreed not to execute against the assets of Mesa, Baumann and Summit. The settlement agreement provided that it was governed by Arizona law and acknowledged that HUG's declaratory judgment action was pending in federal court. The Arizona defendants withdrew their post-trial motions, the time for appeal passed, and the jury verdict became a final judgment of the Arizona court.

On motion of Summit, Crigler was joined as a necessary party to the declaratory judgment action. Summit then moved to have Crigler substituted for Summit as the proper defendant on HUG's complaint for declaratory judgment. Crigler answered on behalf of Baumann and Mesa (whose rights she had assumed in the Arizona settlement agreement) that, because the doctor and hospital were blamelessly ignorant of HUG's notice provisions, they were excused under Tennessee law. The district court found that Summit was HUG's "agent" for purposes of receiving notice under the policy, and since the additional insureds had notified Summit, HUG's notice provisions were satisfied as to Baumann and Mesa; therefore, HUG was liable to Crigler under its policy. The court found it unnecessary to rule on Summit's motion to substitute. *Hospital Underwriting Group v. Summit Health Ltd.,* 719 F.Supp. 627, 634–37 (M.D.Tenn.1989).

After that decision, all that remained for the district court to determine was whether HUG ultimately would have to bear the cost of the $2 million owing on Crigler's claim or would be entitled to judgment on its claim against Summit for indemnification. The district court ordered that the indemnification claim proceed to trial. Faced with the possibility that, in spite of its best efforts to turn this action into a dispute between HUG and Crigler, Summit might yet be found liable for paying the claim it thought it had escaped in 1988, Summit took a new tack. At the indemnification trial, Summit argued that under Arizona law, the settlement agreement it had helped negotiate was invalid. Summit claimed the settlement was unreasonable and collusive because it was excessive in amount and because HUG was not represented, since the attorney for Summit was also representing Baumann and Mesa.

Citing "compelling public policy reasons," the district judge vacated his prior summary judgment order only to the extent that it held HUG liable to Crigler for the unpaid portion of her judgment,[2] and ordered that the issue of the reasonableness of the settlement agreement be briefed and argued. Relying on *United Services Automobile Ass'n v. Morris,* 154 Ariz. 113, 121, 741 P.2d 246, 254 (1987) (en banc), the district court concluded that under Arizona law, HUG would not be bound by the settlement agreement to the extent that the court found the agreement unreasonable or if the court found the agreement collusive. The district court held that Crigler had not proven that the settlement agreement was reasonable and non-collusive; therefore, HUG was not bound by the settlement and was entitled to summary judgment in its favor. The district court did not reach the issue of whether HUG was entitled to indemnification from Summit.

## II.

In spite of Summit's successful diversionary tactics in the district court, the issue before us in this appeal is not whether, because the Arizona settlement is invalid, HUG can escape liability for payment of the amount of the jury verdict that exceeds the primary coverage. The issue here is whether the district court erred in holding (1) that Summit was HUG's agent for purposes of receiving notice of claims against additional insureds, and (2) that despite Summit's failure to notify HUG of the Crigler claim, the additional insureds, Dr. Baumann and Mesa General hospital, were nevertheless entitled

---

2. The district court specifically reaffirmed its earlier holding that Summit was HUG's agent for purposes of receiving notice from additional insureds, and that HUG therefore could not claim the defense of lack of notice.

to coverage under the excess policy because they notified Summit of claims against them. 719 F.Supp. at 634–37. We hold that the district court erred.

■ The parties do not dispute that Tennessee law governs the contract of insurance at issue in this action. Therefore, we must look to the language of the contract itself, and to Tennessee's law of agency, contract and notice. It is well settled in Tennessee that notice provisions of an insurance policy are valid conditions precedent to recovery on the policy, and that the failure to provide the insurer with the required notice may defeat coverage under the policy. *Griffith Motors, Inc. v. Compass Ins. Co.*, 676 S.W.2d 555, 557–58 (Tenn.Ct.App.1983), *cert. denied* (Tenn.1984); *Tennessee Farmers Mut. Ins. Co. v. Nee*, 643 S.W.2d 673, 675–76 (Tenn.Ct.App.), *cert. denied* (Tenn.1982). It is inappropriate, under Tennessee law, to apply constructive notice in a case such as this where the interest of the "agent" is adverse to that of the "principal." *See Corim, Inc. v. Sam Blair Co.*, 721 S.W.2d 256, 259 (Tenn.Ct.App.), *cert. denied* (Tenn.1986). The HUG excess insurance policy explicitly required Summit to give notice to HUG, as soon as practicable after Summit itself received notice of an occurrence, or immediately upon Summit's receiving demand, notice, summons or other process relative to a claim or suit. The fact that HUG provided only Summit, and not Mesa and Baumann, with claims forms and procedure manuals does not transform Summit into the agent of HUG with respect to claims against Mesa and Baumann. As HUG correctly points out, applying general agency principles against an insurer on these facts is illogical, without legal support, and violative of the explicit language of the insurance contract. Thus, the district court's agency analysis is simply wrong.

■ Although Tennessee law is clear that a contractual requirement of notice to an insurer is a condition precedent to recovery under the policy, such a requirement will not, in every case, defeat a claim for coverage. *See Hartford Accident and Indem. Co. v. Creasy*, 530 S.W.2d 778 (Tenn.1975) (holding, *inter alia*, that additional insured's failure to give required notice will be excused if he had no knowledge of the policy and failure was not the result of his own fault or neglect). The HUG insurance contract uses the Tennessee legal standard for notice, which is that an insured must notify the insurer of potential liability under the policy "as soon as practicable." *Reliance Ins. Co. v. Athena Cablevision Corp.*, 560 S.W.2d 617, 618 (Tenn.1977). In applying that phrase to settle insurance coverage disputes, Tennessee's general rule is that the language "as soon as practicable" imposes a duty on the insured to give notice when the insured becomes, or should become, aware of facts to suggest to a reasonably prudent person that the occurrence or action might reasonably be expected to produce a claim against the insurer. *Id.*

■ The Tennessee courts excuse even extreme delay in providing notice in cases where the insured reasonably believed there would be no liability on the policy or could not have notified the insurer because, for example, the additional insured did not know of the policy and was not at fault for not having discovered coverage sooner. *See, e.g., Creasy*, 530 S.W.2d at 780–81 (holding further that the notice provision of a policy for an additional insured will run from the date he actually obtained knowledge of the policy or should have obtained it by exercising reasonable care and diligence); *Spradlin v. Columbia Ins.*, 34 Tenn.App. 17, 232 S.W.2d 605, *cert. denied* (Tenn.1950) (holding that notice is not required by an insured until he has knowledge of the existence of the policy). However, even if genuinely ignorant, a late-notifying insured is not excused simply by claiming ignorance of the policy. "[I]n order for ignorance of coverage to excuse an insured or additional insured from following the procedures set out in an insurance policy, it must be shown that the claimant exercised due diligence and reasonable care in ascertaining that there was coverage under the policy." *Lee v. Lee*, 732 S.W.2d 275, 276 (Tenn.1987). Where, as here, the facts are undisputed regarding the policy's notice requirements and the notice that was given, the reasonableness of the delay is a question of law for the court. *Id.*

■ Here, Mesa and Dr. Baumann were additional insureds who appear to have been genuinely ignorant of the excess insurance policy and its notice provisions. When Dr.

Baumann was served with the Crigler lawsuit, he promptly notified his personal malpractice insurer. Baumann and Mesa also promptly notified Summit. There is no evidence in the record that the doctor and the hospital were not diligent in notifying the insurers of which they were aware.

However, we cannot agree with the district court that Mesa and Baumann were blamelessly ignorant of the excess insurance policy and its notice requirements, nor can we accept the district court's reasoning that agency principles permit a finding that Mesa and Baumann's notification to Summit served to notify HUG. The parties to the Arizona wrongful death action believed that the amount of the primary coverage available through the Meridian policy was $8 million. The mere fact that they considered the Meridian policy to be "primary" indicates a belief that, somewhere out there, there was a policy providing coverage in excess of the primary limits. Mesa and Baumann were at risk of joint and several liability for any eventual judgment on this wrongful death claim. A reasonably prudent person who has been sued for wrongful death may be expected to make every effort to ascertain all insurance coverage that may be available to satisfy the claim. Mesa and Baumann could and should have discovered the existence of the excess policy by exercising due diligence and reasonable care.

Summit's asserted ignorance of the policy and good faith belief that the Crigler claim would not exceed the limits of the primary insurance coverage cannot excuse Summit's failure to notify HUG sooner. There is no dispute that Summit had a copy of the policy in its files. The policy explicitly requires written notice of **occurrences, even within the applicable deductible,** as soon as practicable after any officer located at Summit's principal offices or any person designated by Summit to give such notice has knowledge of the occurrence. The record is clear that, through its risk managers and other employees responsible for purchasing insurance, determining coverage and handling claims, Summit had knowledge of the occurrence soon after Crigler filed suit against Baumann and Mesa. However, HUG was not notified

of the claim until after the jury's verdict, when it became apparent that the insureds' liability would affect the excess policy. Summit failed to exercise the requisite "due diligence and reasonable care" regarding the policy. Untidiness of Summit's recordkeeping and disorganization of roles and responsibilities within Summit's corporate structure do not excuse Summit from complying with its contracts.

■ Summit argues and the district court held that, before being permitted to deny coverage or collect indemnification, the insurer should be required to demonstrate that it was prejudiced by the delay in notification, and that HUG cannot demonstrate such prejudice. It is immaterial that the majority trend is for courts to require a showing of prejudice to permit an insurer to avoid liability on a policy or to collect indemnification for failure to notify, *see* Barry R. Ostrager and Thomas R. Newman, INSURANCE COVERAGE DISPUTES § 4.02(c)(2) at 103–107 (7th ed. 1994). The insurance policy at issue here is governed by Tennessee law, which is quite clear that HUG is *not* required to show prejudice resulting from Summit's failure to notify. *Phoenix Cotton Oil Co. v. Royal Indem. Co.,* 140 Tenn. 438, 205 S.W. 128 (1918), *cited with approval in Creasy,* 530 S.W.2d at 779; *Tennessee Farmers Mut. Ins. Co. v. Nee,* 643 S.W.2d at 675. The Tennessee Supreme Court has declined a lower court's reasoned invitation to overrule *Phoenix Cotton Oil Co.* and follow the emerging majority requiring a showing of prejudice. *See North River Ins. Co. v. Johnson,* 757 S.W.2d 334, 335–36 (Tenn.Ct.App.) (noting it was constrained to hold that there need not be any showing of prejudice, appellate court affirmed trial court's judgment for insurer), *cert. denied* (Tenn.1988). A federal district court in a diversity case is not free to ignore applicable state law, even if the law is unpopular or represents a minority view, especially where the state's legislature and supreme court continue to approve of the law. The district court erred in requiring HUG to demonstrate prejudice.[3]

3. Even if such were not the case, the record clearly supports HUG's argument that it *was*

prejudiced by Summit's failure to notify of the Crigler claim. The failure to notify deprived

The insurance policy in this case required notice of occurrences even within the applicable deductible as a condition precedent to coverage. Summit had knowledge of the policy and its requirements, and could have met its contractual obligation to notify HUG of the Crigler claim by exercising due diligence and reasonable care. Summit's failure to notify HUG is not excusable under Tennessee law, nor is there any requirement that HUG demonstrate prejudice from the lack of notice. Further, HUG is not liable on the policy to Mesa and Baumann, despite their genuine ignorance of the policy, because they could and should have discovered the existence of the policy and its notice requirements by exercising reasonable diligence. Therefore, based on the undisputed evidence in the record, the particularity of the contractual language, and the clarity of Tennessee's law, HUG is not liable under the policy and is entitled to judgment.

## III.

The declaratory judgment action before the district court raised two straightforward alternative claims: (1) that HUG had no liability under the excess policy, and (2) that in the event HUG was found to have any liability under the policy, Summit was required to indemnify HUG for any amounts HUG was required to pay. Although our holding that HUG has no liability under the excess policy is dispositive of this case, we think it is necessary to address the district court's erroneous holding that HUG is entitled to summary judgment in this declaratory judgment action because under Arizona law, the settlement agreement reached in the Arizona case is invalid.

The Arizona wrongful death case was settled between the plaintiff, Mrs. Crigler, and the defendants, Summit, Mesa and Baumann, after judgment had been entered by the court on the jury's $4,000,000 verdict. The settlement was not as to amount; the jury's $4,000,000 verdict was undisturbed. Rather, the settlement was as to liability for payment

of the amount not covered by the primary insurance. Mrs. Crigler agreed to forego her right to collect the balance of the judgment against the defendants themselves in exchange for their assignment to her of whatever rights they had to have the balance of the judgment against them paid by HUG. Subsequent to the settlement, the defendants withdrew their pending post-trial motions for judgment notwithstanding the verdict and for a new trial, and the trial court, after time for appeal had run, ordered all exhibits to be returned to the respective parties. The judgment, no longer appealable, was final. But Summit and HUG now seek to attack that judgment collaterally by claiming that Arizona law permits a federal court in Tennessee to invalidate the settlement agreement integral to the final Arizona judgment on the grounds that the amount of the settlement is excessive and that the agreement was reached in a collusive manner. Setting aside for the moment the breathtaking *chutzpah* displayed by Summit in this maneuver, we think that the district court erred in several respects in buying this argument.

First, the settlement agreement in the Arizona litigation is simply irrelevant to the declaratory judgment action. Either HUG is liable under its contract of insurance to pay the excess of the jury verdict over the primary insurance or it is not. That is the issue that the declaratory judgment action raised, it is a matter of Tennessee law, and as we have already held, HUG has no liability.

Second, the principles of full faith and credit, res judicata and collateral estoppel require that the federal court in Tennessee give to the Arizona judgment the same preclusive effect that the Arizona courts would have given it. The United States Constitution, Art. IV, § 1, as implemented by 28 U.S.C. § 1738, requires federal courts to give full faith and credit to the judicial proceedings of state courts. Federal courts must give the same effect to a state court judgment that would be given by a court of the state in which the judgment was rendered.

HUG of the ability to discharge its obligation to set aside funds to satisfy any eventual payment necessitated by the claim. The failure to notify also deprived HUG of the opportunity to partici-

pate in the Arizona litigation prior to verdict and to bring pressure to bear on the parties to settle the wrongful death action within the limits of the primary insurance policy.

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982); *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 192–93, 61 S.Ct. 513, 517, 85 L.Ed. 725 (1941); *Katt v. Dykhouse*, 983 F.2d 690, 693 (6th Cir.1992). Thus, to determine the preclusive effect of the Arizona state court judgment in this case, we must look to Arizona law. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Katt*, 983 F.2d at 693.

 Arizona law is clear that a judgment is conclusive as to damages. *Dairyland Ins. Co. v. Richards*, 108 Ariz. 89, 91, 492 P.2d 1196, 1198 (1972) (en banc). The amount of damages in a particular case is a question peculiarly within the province of the jury, and the duty to reduce excessive verdicts lies initially with the trial court. *Frontier Motors, Inc. v. Horrall*, 17 Ariz.App. 198, 200, 496 P.2d 624, 626 (1972) (citing *Wise v. Monteros*, 93 Ariz. 124, 379 P.2d 116 (1963); *Allied Van Lines v. Parsons*, 80 Ariz. 88, 293 P.2d 430 (1956)). After the Arizona jury rendered its verdict and judgment had been entered against the defendants, Summit (and the other two defendants) negotiated the Crigler settlement, withdrew all post-trial motions and did not appeal. The amount of that judgment is final. The district court's ruling that the settlement agreement in the Arizona litigation is invalid is primarily grounded on the district court's conclusion that the amount of the jury's verdict, which is the amount of the settlement, is excessive. Arizona law does not permit such an attack. *See Arizona Downs v. Superior Court*, 128 Ariz. 73, 74, 623 P.2d 1229, 1230 (1981); *Standage Ventures, Inc. v. State*, 114 Ariz. 480, 483–84, 562 P.2d 360, 363–64 (1977) (en banc).

 Furthermore, in Arizona, judgments are not set aside by collateral declaratory judgment actions. *Shattuck v. Shattuck*, 67 Ariz. 122, 128–29, 192 P.2d 229, 235–36 (1948).

> [A] declaratory judgment proceeding is not an appropriate method of obtaining the vacation of a judgment; it would be entirely beyond the purpose and scope of the [Declaratory Judgments Act] as well as contrary to fundamental principles for a court to attempt, in such a proceeding, to review and determine the validity of a judgment of a court of coordinate jurisdiction.

*Id.* at 129, 192 P.2d at 236 (citation omitted). Again, it is important to recognize that the district court invalidated the Arizona settlement agreement because it found that the amount of the jury's verdict was excessive and that the Arizona trial judge would have reduced the amount of that verdict. Of course, the trial judge did not do so, and the Arizona judgment became final. The only way an Arizona judgment may be collaterally attacked is if the court lacked subject matter jurisdiction over the case, personal jurisdiction over the parties or jurisdiction to render the particular judgment given, or unless the judgment was the product of extrinsic fraud. Even if the judgment is wrong and could be reversed on appeal or set aside on direct attack, it is not void as against collateral attack. *Walker v. Davies*, 113 Ariz. 233, 235, 550 P.2d 230, 232 (1976).

 Thirdly, even if the Arizona courts would permit a collateral attack by declaratory judgment, the district court erred in its interpretation and application of *United Services Automobile Ass'n v. Morris*, 154 Ariz. 113, 741 P.2d 246 (1987) (en banc), the case on which the district court based its conclusion that the settlement agreement is invalid. Under Arizona law, *Morris* review applies to potentially collusive settlements between claimants and insureds who compromise the rights of insurers who have not had the opportunity to litigate damages.[4] *Bar-*

---

4. Although HUG was not a defendant in the Arizona proceedings, HUG had an opportunity to join the litigation before the verdict passed into final judgment. The defendants repeatedly requested HUG to join in the post-trial motions and settlement negotiations. Because collateral estoppel generally applies to insurers with respect to litigated issues of liability to the injured

party, *see McGough v. Insurance Co. of North America*, 143 Ariz. 26, 30–31, 691 P.2d 738, 742–43 (App.1984), insurers may intervene as of right in actions if "the disposition of the action may as a practical matter impair or impede the [insurer's] ability to protect" its interests. Ariz. R.Civ.P. 24(a). Arizona law permits insurers to intervene as of right even if such intervention

*mat v. John and Jane Doe Partners A–D,* 165 Ariz. 205, 209, 797 P.2d 1223, 1227 (App. 1990) (construing *Morris,* 154 Ariz. 113, 741 P.2d 246). The question decided in *Morris* was whether an insurer could assert a policy's cooperation clause to prevent an insured being defended under a reservation of rights from protecting himself by settling. *Morris,* 154 Ariz. at 118, 741 P.2d at 251. Noting that "[a]n insurer that performs the duty to defend but reserves the right to deny the duty to pay should not be allowed to control the conditions of payment," the Arizona Supreme Court concluded that "[a]n insured being defended under a reservation of rights may enter into a *Damron* agreement[5] without breaching the cooperation clause" so long as the agreement is reasonable and non-collusive. *Id.* at 119–20, 741 P.2d at 252–53 (footnote added).

■ The Crigler case clearly is not a *Morris* situation. The obvious distinction between the two is that HUG did not defend against the Crigler claim under a reservation of rights. HUG did not defend against the claim at all. Rather, HUG denied coverage. The Arizona courts have made it clear that an insurer's refusal to defend is a breach of the insurance contract. *See Arizona Property & Casualty Ins. Guar. Fund v. Helme,* 153 Ariz. 129, 137, 735 P.2d 451, 459 (1987) (en banc). To apply *Morris* to this case would be to hold that where the insurer breaches by denying coverage and refusing to defend, it may still require the insured to abide by the cooperation clause in the policy and may preclude the insured from protecting itself by settling the litigation that the insurer refuses to defend. Since the purpose of the cooperation clause is to require the

insured to aid the insurer in the defense, the illogic of this approach is apparent.

■ Furthermore, *Morris* does not apply to cases wherein the merits have been decided by a jury after a fully-contested trial of all issues and a verdict has been rendered for the plaintiff against the insured. The whole point of *Morris* is to provide the framework for determining whether a *pre-trial* settlement between a claimant and an insured being defended under a reservation of rights is reasonable and not fraudulent or collusive, and thus not a breach of the insurance policy's cooperation clause. The test is "what a reasonably prudent person in the insureds' position would have settled for on the merits of the claimant's case. This involves evaluating the facts bearing on the liability and damage aspects of claimant's case, as well as the risks of going to trial." *Morris,* 154 Ariz. at 121, 741 P.2d at 254 (citations omitted). The impossibility of applying this standard to a post-verdict settlement is obvious.

■ Under Arizona law, insureds who find themselves facing exposure in excess of available insurance coverage or denial of coverage by the insurer are permitted to enter into settlement agreements with claimants. *Damron v. Sledge,* 105 Ariz. 151, 153, 460 P.2d 997, 999 (1969).[6] The burden is not then on the claimant to justify the reasonableness of the settlement; rather, the party attacking the settlement bears the burden of proving its invalidity. *Barmat,* 165 Ariz. at 209, 797 P.2d at 1227 ("We do not assume that parties to an agreement acted collusively. We presume that they acted in good

---

might seem untimely or inconvenient to the parties in the lawsuit. *See Purvis v. Hartford Accident and Indem. Co.,* 179 Ariz. 254, 877 P.2d 827 (App.1994) (permitting insurer to intervene as of right in a trial on damages after its insured and the plaintiff in the wrongful death action entered into a settlement agreement). Thus, HUG cannot be said not to have had an opportunity to litigate the damages in this case.

5. A *Damron* agreement permits an insured to assign to the injured party, before or after judgment, the insured's rights against the insurer for bad faith or breach on the part of the insurer. *Damron v. Sledge,* 105 Ariz. 151, 153, 460 P.2d

997, 999 (1969). The Crigler settlement was a type of *Damron* agreement.

6. *See also Helme,* 153 Ariz. 129, 137–38, 735 P.2d 451, 459–60 (holding that once an insurer breaches *any* duty to an insured, the insured is no longer fully bound by the cooperation clause and may settle to protect himself from the danger to which the insurer has exposed him); *Kepner v. Western Fire Ins. Co.,* 109 Ariz. 329, 332, 509 P.2d 222, 225 (1973) (en banc) (holding that if an insurer refuses to defend under the policy and awaits determination of its obligation in a subsequent proceeding, it acts at its peril and must bear the consequences of its breach).

faith and require the challenging party to prove a lack thereof.").

Finally, even if *Morris* applied to this case, the settlement was neither fraudulent nor collusive. The parties to the agreement had the right to settle the litigation by compromise, the terms of the agreement were not unreasonable, and as discussed above, under Arizona law, HUG had the right, although not the duty, to intervene in the Arizona litigation. Under those circumstances, the settlement simply is not collusive.

## IV.

The district court's order finding HUG liable on the policy of excess insurance is REVERSED; the court's order holding that the Arizona settlement agreement is invalid is REVERSED; and the case is REMANDED with instructions to the district court to enter judgment in favor of HUG finding no liability under the policy.