Kevin SMITH, Plaintiff–Appellant,

v.

CITY OF INKSTER; Hillard L. Hampton, Jr.; Board of Trustees of the Policemen and Firemen Retirement System of the City of Inkster, Defendants–Appellees.

No. 15–1585.

United States Court of Appeals, Sixth Circuit.

March 25, 2016.

---

BEFORE: COLE, Chief Judge;
MERRITT and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Kevin Smith claims defendants delayed and ultimately denied his application for disability pension benefits under the City of Inkster's Charter because he is Caucasian and in retaliation for engaging in protected activity in violation of Title VII and 42 U.S.C. § 1983. The district court dismissed the complaint on the grounds of res judicata and collateral estoppel based on Smith's prior claim for Michigan workers' compensation benefits and prior litigation against Inkster for constructive discharge. It also treated Smith's § 1983 claims as arising under the Due Process Clause, and dismissed them for failing to identify an applicable constitutional violation. With the exception of the district court's ruling dismissing the § 1983 retaliation claim, we disagree. Accordingly, we affirm in part, and reverse and remand in part.

## I.

On June 18, 2008, the Inkster Police Department reassigned plaintiff from Detective Lieutenant to Road Patrol Lieutenant. Smith called in sick the next day, never reported to his new assignment, and has not worked for Inkster since. Instead, Smith took three actions. First, he filed a claim for workers' compensation benefits under Michigan law. Second, he commenced lawsuits alleging his reassignment was in retaliation for having engaged in protected activity and because he is Caucasian. Third, he sought disability retirement benefits under Inkster's Charter and upon his application's denial, he filed this litigation.

### A.

Smith filed for workers' compensation benefits under Michigan's Worker's Disability Compensation Act, Mich. Comp. Laws § 418.101 et seq., claiming that he sustained a work-related injury caused by "stress related to work." He "specifically alleged that physical exertion, as well as physical and emotional stress, related to [his] employment caused a cardiac disability." After an April 2010 hearing, a state magistrate concluded Smith suffered a work-related cardiac condition and that he was temporarily disabled from June 18, 2008, through November 30, 2008.

### B.

Smith filed lawsuits in Michigan state court (the "2008 state litigation") and the Eastern District of Michigan (the "2008 federal litigation") against Inkster and several of its employees. These lawsuits generally alleged that Inkster reassigned him (1) in retaliation for testifying against the city in a case brought by a fellow officer, Thomas Diaz, in violation of Michigan's Whistleblower Protection Act, Mich. Comp. Laws § 15.362, and (2) on account of his race in violation of Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq., and 42 U.S.C. §§ 1981 and 1983. The 2008 state litigation proceeded to trial in January 2011. A jury concluded that Smith's testimony for Diaz caused his reassignment and awarded both back and front pay to the tune of $700,000, plus attorneys' fees. On March 30, 2011, the state court entered judgment for Smith and closed the case. The parties subsequently dismissed the 2008 federal litigation.

### C.

Inkster's Charter provides a variety of retirement and other benefits to its police and fire department employees, including benefits based on an employee's disability. Defendant Board of Trustees of the Policemen and Firemen Retirement System of the City of Inkster ("Board") oversees

these benefits. The disability retirement benefits provision grants a disability pension to employees whose employment is terminated "because of duty total disability": "the inability of an employee ... to perform the duties of his position because of accident sustained in or illness contracted in or arising from the discharge of any duty which said member officially owed the fire or police force of the City of Inkster ... whether performed while on duty or leave." The Charter does not set forth a time by which an employee must apply for disability retirement benefits.

Section 18.4 of the Charter addresses the situation presented here—when there is conflicting evidence as to the applicant's disability entitlement:

> The extent and continuation of disability shall in all cases of dispute be referred to a commission consisting of one reputable physician named by the board and one reputable physician named by the person claiming disability. The decision of such commission shall be made in writing and filed with the board. *In all cases where there is a disagreement between the two physicians, they shall appoint a third physician, whose decision on such matters shall be final.* In all cases where there is a dispute as to the cause of disability, such dispute shall be referred to the board whose decision on such matters shall be final.

(Emphasis added.) The Board's physician disagreed with Smith's physician regarding Smith's ability to return to work, triggering the referral to a third physician for a "final" decision. Regrettably, this never occurred, and this failure forms the foundation of Smith's claims in this litigation.

Smith submitted a "request to apply for a medical retirement through the Inkster Pension Board" on January 4, 2011 (just before his jury trial in the 2008 state litigation). He did so after encouragement

from one of the Board's trustees. Nonetheless, the trustee cautioned Smith that this would be an uphill battle, stating:

> You know what the Mayor's position on you is, right? You ain't getting shit. You testified for Diaz and you sued his ass so, you know, he's pissed off and you're not going to get anything. But we can work around him. We've done it before.

The mayor, defendant Hampton, is also one of the Board's trustees.

On May 12, 2011 (almost two months after the state court entered judgment for Smith), Smith submitted physician letters in support of his disability retirement application. The three letters summarily concluded Smith could not return to work. Upon Inkster's request, Smith saw a cardiologist, Dr. Levinson. Dr. Levinson concluded in July 2011 that Smith's "cardiac and lung condition d[id] not reach the level of retirement disability," but that Smith needed to be evaluated by a clinical psychologist or psychiatrist because "there seems to be no question that job related stress has had a major impact on [Smith's] ability to perform his usual and customary employment."

On August 4, 2011, the Board considered Dr. Levinson's opinion in relation to Smith's medical evidence. Because "[n]one of the physician letters presented by Mr. Smith indicate[d] that he [was] totally and permanently disabled, ... [it] advised Mr. Smith that he would need to present correspondence from his physician indicating that he is totally and permanently disabled and at that point they would send him again to the Retirement System's medical authority, one who specialized in psychiatric care." One of Smith's physicians did this, so the Board arranged for Smith to be evaluated by a psychiatrist. The Board's adoption of Dr.

Levinson's findings constitutes a denial of Smith's application.

Smith saw Dr. Ager, a psychiatrist, on August 23, 2011. Dr. Ager concluded that Smith, although "somewhat paranoid" and "somewhat angry and mildly depressed," was not disabled "to the point where [he] believe[d] it would impair [Smith's] ability to work as a police officer." Accordingly, Dr. Ager found that Smith "has the capacity to work as a police officer, if not for the City of Inkster, for some other municipality."

Because Dr. Ager "did not find Mr. Smith to be totally and permanently disabled," the Board moved on September 1, 2011, "that a third physician, one who would be agreeable to both Mr. Smith's attending physician and the Retirement System's medical authority, be consulted for a final and binding decision as to Mr. Smith's disability status" pursuant to § 18.4 of the Charter. As with Dr. Levinson's conclusions, the Board's agreement with Dr. Ager's findings also functioned as a denial of Smith's application.

No third physician was (or has ever been) appointed. The Board generally contends its third-party vendor was working on finding a third physician but had a hard time reaching Smith's physician. Smith largely responds that his doctor was never contacted, that Dr. Ager was unresponsive, and that defendants intentionally delayed the selection of the third physician. Smith also contends that his application should have never reached the third physician stage regardless, arguing that other individuals were not held to the same scrutiny and that the Board cherry-picked doctors (Drs. Ager and Levinson)

that it knew would conclude Smith was not disabled.

Smith commenced this litigation in December 2012. Count I alleges defendants retaliated against him in violation of Title VII, 42 U.S.C. § 1983, and Michigan law. Count II alleges defendants discriminated against him on the basis of his race in violation of Title VII, 42 U.S.C. § 1983, and Michigan law. Counts III and IV allege conspiracy and intentional infliction of emotional distress under Michigan law. The district court declined to exercise supplemental jurisdiction over Smith's state-law claims, dismissing them without prejudice.[1]

Following discovery, defendants moved for summary judgment on various grounds, raising res judicata, collateral estoppel, and merit-based arguments. The district court granted partial summary judgment to the Board as to Smith's Title VII claims because it was not an employer or agent under Title VII, but declined to enter summary judgment on the remaining claims. Upon defendants' motions for reconsideration, the district court concluded that res judicata precluded Smith's claims because his "entitlement to a duty disability pension could have and should have been raised" during his workers' compensation proceeding and 2008 state litigation. The district court also concluded that Smith was "collaterally estopped from arguing he [was] permanently disabled beyond November of 2008" given the magistrate's conclusion that he was able to return to work after this date. Finally, the district court analyzed Smith's § 1983 claims under a due process rubric, and dismissed them because he "failed to iden-

---

1. Smith refiled his state law claims in Michigan state court. That court dismissed his claims against the Board in June 2014, on the ground, as pertinent here, that the Board was not Smith's employer. It then relied upon the district court's res judicata and collateral estoppel conclusions to dismiss Smith's claims against Inkster and Hampton in July 2015. Smith did not appeal these decisions.

tify a constitutionally-protected property interest."

## II.

■ Smith first contends the district court erred in giving preclusive effect to his workers' compensation benefits claim and the 2008 state litigation. We review de novo a district court's application of res judicata, with the party asserting the defense bearing the burden of proof. *Winget v. JP Morgan Chase Bank, N.A.,* 537 F.3d 565, 572 (6th Cir.2008).

"Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state." *Abbott v. Michigan,* 474 F.3d 324, 330 (6th Cir.2007). Michigan takes a "broad approach to the doctrine of res judicata." *Adair v. State,* 470 Mich. 105, 680 N.W.2d 386, 396 (2004). The doctrine "bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, *or could have been,* resolved in the first." *Id.* (emphasis added). Res judicata "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Id.* This broad interpretation, however, does not equate "claims arising out of the same transaction" with "all claims that accrue before entry of a final award." *Banks v. LAB Lansing Body Assembly,* 271 Mich.App. 227, 231–32, 720 N.W.2d 756 (2006); *see also McCoy v. Michigan,* 369 Fed.Appx. 646, 651 (6th Cir.2010) ("Although Michigan employs a broad view of res judicata,

we do not believe that the preclusion of claims that could have been resolved in the previous litigation necessarily includes new and independent claims that arise after the original pleading in the first suit has been filed.").

"Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in time, space, origin or motivation, [and] whether they form a convenient trial unit." *Adair,* 680 N.W.2d at 398 (citation and emphasis omitted). We view claims "in factual terms ... coterminous with the transaction, regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; and regardless of the variations in the evidence needed to support the theories or rights." *Id.* (alterations and citation omitted).

In concluding Smith's claim could have been resolved in the 2008 state litigation,[2] the district court conflated Smith's ability to apply for disability retirement under the Charter with having a legally cognizable cause of action. According to the district court, Smith's reassignment was the analytical locus:

> All of Plaintiff's claims in this action arise from events that are related in time, space, origin and motivation; specifically, the notice of Plaintiff's reassignment from the detective bureau to road patrol. This event gave rise to Plaintiff's workers compensation action, the state court action and this action. Plaintiff's entitlement to a duty disability pension could have and should have been raised in the previous actions.

**2.** To the extent the district court relied upon the workers' compensation claim to preclude his federal claims here, the parties agree this was error. First, Smith filed for disability retirement *after* resolution of his workers'

compensation claim. Second, the Michigan Workers' Compensation Agency does not have jurisdiction over his claims in this litigation. *Cf. Horn v. Dep't of Corr.,* 216 Mich.App. 58, 63, 548 N.W.2d 660 (1996).

The fault in this conclusion is that while the reasons for defendants' alleged actions—Smith's race and testimony in Diaz's lawsuit—are also present here, the alleged discriminatory action is different and, more importantly, is one that did not occur until after the 2008 state litigation concluded.

The proper focal point of Smith's present claims (*i.e.*, the "transaction") is the events that occurred *after* the March 2011 entry of final judgment in the 2008 state litigation. By then, Smith had put defendants on notice of his intention to apply for disability retirement, but had not yet put forth his own medical evidence showing a disability—that came in May. The Board did not formally set aside this evidence until August, when it requested that Smith provide further evidence of total and permanent disability and that he undergo an examination with a psychiatrist.

Smith's ability to advance retaliation and race discrimination claims against defendants for unlawfully delaying and denying his application—his causes of action—did not ripen until defendants took the allegedly retaliatory and discriminatory acts against him. He did not know, nor did he have reason to know, that defendants were going to injure him until after the 2008 state litigation concluded. These claims could not have been resolved in that litigation. *See Katt v. Dykhouse*, 983 F.2d 690, 693–94 (6th Cir.1992); *see also Elder v. Twp. of Harrison*, 489 Fed.Appx. 934, 937 (6th Cir.2012) ("The Elders' civil rights complaint did not allege new factual allegations relating to their defamation claims, but raised new causes of action that accrued after the filing of their defamation case."); *McCoy*, 369 Fed.Appx. at 651 ("The gravamen of McCoy's federal complaint is that his 2004 termination and the activities and complaints surrounding that termination, which took place from June 2004 onward, are, despite everything that may have occurred previously, themselves actionable. In essence, the origin of the two claims is simply not the same."). Were we to apply res judicata to Smith's unripe claims, we would "essentially require mandatory joinder of ... mere potential ... claim[s.]" *Adam v. Bell*, No. 319778, 311 Mich.App. 528, 537, 879 N.W.2d 879, 884, 2015 WL 4743039, at *4 (Mich.Ct.App. Aug. 11, 2015). Therefore, Smith's claims "were neither actually litigated nor litigable ... [and] should not have been barred by the doctrine of res judicata." *P.T. Today, Inc. v. Comm'r of Office of Fin. & Ins. Servs.*, 270 Mich.App. 110, 147, 715 N.W.2d 398 (2006).

*Young v. Township of Green Oak* does not dictate the opposite conclusion. Following a work-related injury, the Township of Green Oak refused to return Young to work, keeping him on non-active status. 471 F.3d 674, 675–76 (6th Cir.2006). Young filed several lawsuits, contending Green Oak violated Michigan's civil rights, disability, and whistleblower protection statutes, and § 1983, by failing to allow him to return to work and by failing to promote him on account of his age, disability, and protected activity. *Id.* at 677–78. After resolution of these lawsuits, Green Oak formally terminated his employment upon notice and hearing, resulting in new federal litigation. *Id.* Young raised similar employment claims, as well as alleged claims under Michigan's Veterans Preference Act and procedural due process. *Id.*

We held that res judicata applied to some, but not all, of Young's claims. Notably, we applied res judicata to Young's employment claims, rejecting the argument that these claims did not ripen until after he received formal notice of termination because "[a]n employer's refusal to undo a discriminatory decision is not a

fresh act of discrimination." *Id.* at 681–83 (citing *Yinger v. City of Dearborn,* 132 F.3d 35 (6th Cir.1997) (unpublished table decision)). In so doing, we noted Young's employment claims arose from Green Oak's "refusal to return him to work." *Id.* at 682. However, we drew a distinction between claims that he could have brought and did not in prior litigation, and those that he could not have raised in prior litigation. We refused to give preclusive effect to the prior proceedings for his procedural due process and Michigan's Veterans Preference Act claims because he could not have raised those claims until *after* a hearing. *Id.* at 683. Thus, *Young* confirms that a plaintiff, like Smith, cannot be precluded from bringing claims that did not ripen until after the conclusion of prior litigation.

As discussed, the transaction forming the basis of Smith's claims did not ripen until after the 2008 state litigation concluded. It was his reassignment that gave rise to his workers' compensation claim and 2008 state litigation. But the operative launching point for Smith's claims in this litigation stem from the Board's decision to set aside the opinions of Smith's physicians in light of its own physicians' conclusions, not his reassignment. Simply put, this transaction was not part of defendants' continuing discrimination against Smith, but rather was a separate and fresh transaction occurring several months after entry of judgment in the 2008 state litigation.[3]

Smith could not have brought the claims he raises here in the 2008 state litigation,

and therefore res judicata does not bar his claims.

### III.

■ The district court also dismissed Smith's claims on the basis of collateral estoppel, reasoning that because the Michigan Workers' Compensation Agency magistrate "determined that Plaintiff was only permanently and totally disabled for five months after his last day of employment with the City, ... [he was] collaterally estopped from arguing he is permanently disabled beyond November of 2008." Smith contends this was erroneous, and we agree.

"[T]he availability of collateral estoppel is a mixed question of law and fact which this court reviews de novo." *Wolfe v. Perry,* 412 F.3d 707, 716 (6th Cir.2005) (citation omitted). "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott,* 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (alterations, internal quotation marks, and citation omitted). We ask three questions to determine whether collateral estoppel applies in this instance: "[F]irst, was the agency acting in a judicial capacity; second, would the decision have preclusive effect under [state] law; and third, does the federal action seek to litigate issues already deter-

---

**3.** That Smith sought recovery of lost regular pension benefits and raised issues of mental health during the 2008 state litigation does not compel the conclusion that his claim for disability retirement was indeed resolved in that litigation. This confuses Smith's request for damages in the 2008 state litigation with his underlying ability to bring a claim of retal-

iation and discrimination for denying his application for disability retirement. We also note Michigan law generally prohibits double recovery for one injury, with overlapping damages set off, thus mitigating defendants' double recovery concerns. *See, e.g., Great N. Packaging, Inc. v. Gen. Tire & Rubber Co.,* 154 Mich.App. 777, 781, 399 N.W.2d 408 (1986).

mined by the state agency"? *Nelson v. Jefferson Cty., Ky.*, 863 F.2d 18, 19 (6th Cir.1988). Because the answer to the second and third questions is no, we reverse for two, separate reasons.

First, decisions by Michigan's Workers' Compensation Agency can have a preclusive effect under Michigan law. *See, e.g., Blazic v. Cty. of Wayne*, 460 Mich. 868, 598 N.W.2d 346 (1999). "Generally, for collateral estoppel to apply three elements must be satisfied: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel." *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 677 N.W.2d 843, 845–46 (2004) (brackets, citation, and quotation marks omitted). Smith's sole contention as to why he is disabled under Inkster's Charter is that his psychiatric status prevents him from returning to work. Thus, for collateral estoppel to apply, that status needed to be essential to his workers' compensation claim, actually litigated, and determined by a valid and final judgment.

Smith did not claim, nor did the magistrate find, that he was pursuing a claim on the basis of his mental condition before that tribunal. To be sure, the magistrate heard evidence regarding Smith's mental health, including that he had been diagnosed with "a major depressive disorder" and that he "was unable to function due to PTSD and severe stressors secondary to his job." However, the magistrate made clear that Smith made a claim only for his heart condition, noting that he "specifically alleged that physical exertion, as well as physical and emotional stress, related to [his] employment *caused a cardiac disability*." (Emphasis added.) And in discussing this claim, the magistrate distinguished

between Smith's mental health condition and his claim for benefits arising from his cardiac condition:

> At trial, plaintiff did not distinguish between his cardiac type symptoms and his mental condition when he testified as to an inability to work at defendant.... However, ... he testified that the physical symptoms had cleared by the latter part of November '2008 and he was doing well. *Plaintiff testified further that the psychiatrist was keeping him off work because of his mental condition, which has not been alleged.*
>
> \*      \*      \*
>
> *And although [his mental health] condition[ ] may be disabling, there [h]as been no allegation of work relationship nor has there been any testimony establishing a causal relationship between work and the conditions diagnosed by Drs. Griffin and Mistry.*

(Emphasis added.) Because Smith's mental status was not adjudicated in the Michigan's Workers' Compensation judgment, collateral estoppel does not apply.

■ Collateral estoppel does not apply for another reason. This federal action does not seek to litigate issues already determined by Michigan's Workers' Compensation Agency. The issue litigated there was whether Smith was disabled as a result of his employment at the time of the magistrate's decision. But here, Smith's ability to return to work has no import in deciding whether defendants denied his application for disability retirement because he is Caucasian or because he testified on behalf of Diaz and filed his own lawsuit against the city.

The district court erred in dismissing Smith's claims based upon collateral estoppel.

## IV.

Smith's final claim of error is that the district court mistakenly analyzed his § 1983 claims under a due process framework instead of under equal protection. The district court reasoned that the deprivation of employment benefits, like Inkster's disability retirement program, "is an interest that can be and should be redressed by a state breach of contract action and not by a federal action under section 1983." (Citing *Ramsey v. Bd. of Educ. of Whitley Cty., Ky.,* 844 F.2d 1268, 1274–75 (6th Cir.1988)). Accordingly, the district court held that Smith could not "establish a constitutionally protected interest" sufficient to make a § 1983 claim because he "has no constitutional right to his duty disability benefits." This conclusion constitutes reversible error.

The parties made clear below (and reiterate here) that race provides the prism through which a jury must view this case, beginning with the 272 paragraphs of Smith's complaint supporting his race discrimination claims under Title VII and § 1983. *See also* R. 77, Pg. ID 2275 ("Defendant Pension Board improperly argues that Plaintiff seeks this Court to give him his pension.... That is not correct, nor an issue before this Court. Plaintiff filed suit because Defendants retaliated and discriminated against him."). Moreover, the elements for establishing equal protection claims under § 1983 are the same as the elements for establishing § 1983 disparate treatment claims. *Deleon v. Kalamazoo Cty. Rd. Comm'n,* 739 F.3d 914, 917–18 (6th Cir.2014). Given this, the district court's unilateral conversion of Smith's § 1983 race discrimination claims into § 1983 due process claims was error. And for the same reasons, Smith's unexplained failure to expressly reference the Equal Protection Clause in the context of his § 1983 claim does not rise to the level of forfeiture.

Alternatively, the Board repeats its argument advanced below that Smith failed to establish a genuine issue of material fact as to the Board treating him differently than similarly situated applicants. The district court rejected this argument in its original denial of summary judgment. Accordingly, the Board's argument effectively seeks to appeal the district court's denial of its motion for summary judgment, which is not a final decision over which we have jurisdiction. 28 U.S.C. § 1291; *see also Solomon v. Aetna Life Ins. Co.,* 782 F.2d 58, 59–60 (6th Cir.1986).

Finally, we affirm the district court's dismissal of Smith's § 1983 retaliation claims. *See Taylor v. McKee,* 649 F.3d 446, 450 (6th Cir.2011) ("[T]his court may affirm the decision of the district court if it is correct for any reason, even a reason different from that relied upon by the district court."). A "retaliation claim does not ... arise under the Equal Protection Clause." *R.S.W.W., Inc. v. City of Keego Harbor,* 397 F.3d 427, 440 (6th Cir.2005).

## V.

For these reasons, we affirm the district court's dismissal of Smith's § 1983 retaliation claims, but reverse the dismissal of his other claims and remand for further proceedings.